# RAKAS ET AL. *v.* ILLINOIS

No. 77–5781.  Argued October 3, 1978—Decided December 5, 1978

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Powell, and Blackmun, JJ., joined. Powell, J., filed a concurring opinion, in which Burger, C. J., joined, *post*, p. 150. White, J., filed a dissenting opinion, in which Brennan, Marshall, and Stevens, JJ., joined, *post*, p. 156.

*G. Joseph Weller* argued the cause for petitioners. With him on the briefs were *Robert Agostinelli* and *Mark W. Burkhalter.*

*Donald B. Mackay,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *William J. Scott,* Attorney General, and *Melbourne A. Noel, Jr.,* and *Michael B. Weinstein,* Assistant Attorneys General.*

Mr. Justice Rehnquist delivered the opinion of the Court.

Petitioners were convicted of armed robbery in the Circuit Court of Kankakee County, Ill., and their convictions were affirmed on appeal. At their trial, the prosecution offered into evidence a sawed-off rifle and rifle shells that had been seized by police during a search of an automobile in which petitioners had been passengers. Neither petitioner is the owner of the automobile and neither has ever asserted that he owned the rifle or shells seized. The Illinois Appellate Court held that petitioners lacked standing to object to the allegedly

---

*Fred Inbau, Frank Carrington, Wayne W. Schmidt, Robert Smith,* and *James P. Costello* filed a brief for Effective Law Enforcement, Inc., as *amicus curiae* urging affirmance.

unlawful search and seizure and denied their motion to suppress the evidence. We granted certiorari in light of the obvious importance of the issues raised to the administration of criminal justice, 435 U. S. 922 (1978), and now affirm.

## I

Because we are not here concerned with the issue of probable cause, a brief description of the events leading to the search of the automobile will suffice. A police officer on a routine patrol received a radio call notifying him of a robbery of a clothing store in Bourbonnais, Ill., and describing the getaway car. Shortly thereafter, the officer spotted an automobile which he thought might be the getaway car. After following the car for some time and after the arrival of assistance, he and several other officers stopped the vehicle. The occupants of the automobile, petitioners and two female companions, were ordered out of the car and, after the occupants had left the car, two officers searched the interior of the vehicle. They discovered a box of rifle shells in the glove compartment, which had been locked, and a sawed-off rifle under the front passenger seat. App. 10–11. After discovering the rifle and the shells, the officers took petitioners to the station and placed them under arrest.

Before trial petitioners moved to suppress the rifle and shells seized from the car on the ground that the search violated the Fourth and Fourteenth Amendments. They conceded that they did not own the automobile and were simply passengers; the owner of the car had been the driver of the vehicle at the time of the search. Nor did they assert that they owned the rifle or the shells seized.[1] The prose-

---

[1] Petitioners claim that they were never asked whether they owned the rifle or shells seized during the search and, citing *Combs* v. *United States*, 408 U. S. 224 (1972), argue that if the Court determines that a property interest in the items seized is an adequate ground for standing to object to their seizure, the Court should remand the case for further

cutor challenged petitioners' standing to object to the lawfulness of the search of the car because neither the car, the shells nor the rifle belonged to them. The trial court agreed that petitioners lacked standing and denied the motion to suppress the evidence. App. 23–24. In view of this holding, the court did not determine whether there was probable cause for the search and seizure. On appeal after petitioners' conviction, the Appellate Court of Illinois, Third Judicial District, affirmed the trial court's denial of petitioners' motion to suppress because it held that "without a proprietary or other similar interest in an automobile, a mere passenger therein lacks standing to challenge the legality of the search of the vehicle."

---

proceedings on the question whether petitioners owned the seized rifle or shells. Reply Brief for Petitioners 4 n. 2. Petitioners do not now assert that they own the rifle or the shells.

We reject petitioners' suggestion. The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. See *Simmons* v. *United States*, 390 U. S. 377, 389–390 (1968); *Jones* v. *United States*, 362 U. S. 257, 261 (1960). The prosecutor argued that petitioners lacked standing to challenge the search because they did not own the rifle, the shells or the automobile. Petitioners did not contest the factual predicates of the prosecutor's argument and instead, simply stated that they were not required to prove ownership to object to the search. App. 23. The prosecutor's argument gave petitioners notice that they were to be put to their proof on any issue as to which they had the burden, and because of their failure to assert ownership, we must assume, for purposes of our review, that petitioners do not own the rifle or the shells. *Combs* v. *United States, supra,* was quite different. In *Combs*, the Government had not challenged Combs' standing at the suppression hearing and the issue of standing was not raised until the appellate level, where the Government conceded that its warrant was not based on probable cause. Because the record was "virtually barren of the facts necessary to determine" Combs' right to contest the search and seizure, the Court remanded the case for further proceedings. 408 U. S., at 227. The Government had requested the Court to remand for further proceedings on this issue. Brief for United States in *Combs* v. *United States*, O. T. 1971, No. 71–517, pp. 40–41.

46 Ill. App. 3d 569, 571, 360 N. E. 2d 1252, 1253 (1977). The court stated:

> "We believe that defendants failed to establish any prejudice to their own constitutional rights because they were not persons aggrieved by the unlawful search and seizure. . . . They wrongly seek to establish prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else and fail to prove an invasion of their own privacy. *Alderman* v. *United States* (1969), 394 U. S. 165 . . . ." *Id.*, at 571–572, 360 N. E. 2d, at 1254.

The Illinois Supreme Court denied petitioners leave to appeal.

## II

Petitioners first urge us to relax or broaden the rule of standing enunciated in *Jones* v. *United States*, 362 U. S. 257 (1960), so that any criminal defendant at whom a search was "directed" would have standing to contest the legality of that search and object to the admission at trial of evidence obtained as a result of the search. Alternatively, petitioners argue that they have standing to object to the search under *Jones* because they were "legitimately on [the] premises" at the time of the search.

The concept of standing discussed in *Jones* focuses on whether the person seeking to challenge the legality of a search as a basis for suppressing evidence was himself the "victim" of the search or seizure. *Id.*, at 261.[2] Adoption of

---

[2] Although *Jones* v. *United States* was based upon an interpretation of Fed. Rule Crim. Proc. 41 (e), the Court stated in *Alderman* v. *United States*, 394 U. S. 165, 173 n. 6 (1969), that Rule 41 (e) conforms to the general standard and is no broader than the constitutional rule. See *United States* v. *Calandra*, 414 U. S. 338, 348–349, n. 6 (1974).

There is an aspect of traditional standing doctrine that was not considered in *Jones* and which we do not question. It is the proposition that a party seeking relief must allege such a personal stake or interest in

the so-called "target" theory advanced by petitioners would in effect permit a defendant to assert that a violation of the Fourth Amendment rights of a third party entitled him to have evidence suppressed at his trial. If we reject petitioners' request for a broadened rule of standing such as this, and reaffirm the holding of *Jones* and other cases that Fourth Amendment rights are personal rights that may not be asserted vicariously, we will have occasion to re-examine the "standing" terminology emphasized in *Jones*. For we are not at all sure that the determination of a motion to suppress is materially aided by labeling the inquiry identified in *Jones* as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge. We shall therefore consider in turn petitioners' target theory, the necessity for continued adherence to the notion of standing discussed in *Jones* as a concept that is theoretically distinct from the merits of a defendant's Fourth Amendment claim, and, finally, the proper disposition of petitioners' ultimate claim in this case.

## A

We decline to extend the rule of standing in Fourth Amendment cases in the manner suggested by petitioners. As we stated in *Alderman* v. *United States*, 394 U. S. 165, 174 (1969), "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously

the outcome of the controversy as to assure the concrete adverseness which Art. III requires. See, *e. g., O'Shea* v. *Littleton*, 414 U. S. 488, 493 (1974); *Flast* v. *Cohen*, 392 U. S. 83, 99 (1968); *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). Thus, a person whose Fourth Amendment rights were violated by a search or seizure, but who is not a defendant in a criminal action in which the illegally seized evidence is sought to be introduced, would not have standing to invoke the exclusionary rule to prevent use of that evidence in that action. See *Calandra, supra,* at 352 n. 8.

asserted." See *Brown* v. *United States,* 411 U. S. 223, 230 (1973); *Simmons* v. *United States,* 390 U. S. 377, 389 (1968); *Wong Sun* v. *United States,* 371 U. S. 471, 492 (1963); cf. *Silverman* v. *United States,* 365 U. S. 505, 511 (1961); *Gouled* v. *United States,* 255 U. S. 298, 304 (1921). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. *Alderman, supra,* at 174. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, *United States* v. *Calandra,* 414 U. S. 338, 347 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.[3] See *Simmons* v. *United States, supra,* at 389. There is no reason to think that a party whose rights have been infringed will not, if evidence is used against him, have ample motivation to move to suppress it. *Alderman, supra,* at 174. Even if such a person is not a defendant in the action, he may be able to recover damages for the violation of his Fourth Amendment rights, see *Monroe* v. *Pape,* 365 U. S. 167 (1961), or seek redress under state law for invasion of privacy or trespass.

In support of their target theory, petitioners rely on the following quotation from *Jones:*

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was*

---

[3] The necessity for a showing of a violation of personal rights is not obviated by recognizing the deterrent purpose of the exclusionary rule, *Alderman* v. *United States, supra,* at 174. Despite the deterrent aim of the exclusionary rule, we never have held that unlawfully seized evidence is inadmissible in all proceedings or against all persons. See, *e. g., United States* v. *Ceccolini,* 435 U. S. 268, 275 (1978); *Stone* v. *Powell,* 428 U. S. 465, 486 (1976); *United States* v. *Calandra,* 414 U. S., at 348. "[T]he application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Ibid.*

*directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U. S., at 261 (emphasis added).

They also rely on *Bumper* v. *North Carolina,* 391 U. S. 543, 548 n. 11 (1968), and *United States* v. *Jeffers,* 342 U. S. 48 (1951).

The above-quoted statement from *Jones* suggests that the italicized language was meant merely as a parenthetical equivalent of the previous phrase "a victim of a search or seizure." To the extent that the language might be read more broadly, it is dictum which was impliedly repudiated in *Alderman* v. *United States, supra,* and which we now expressly reject. In *Jones,* the Court set forth two alternative holdings: It established a rule of "automatic" standing to contest an allegedly illegal search where the same possession needed to establish standing is an essential element of the offense charged; [4] and second, it stated that "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress." 362 U. S., at 264, 267. See *Combs* v. *United States,* 408 U. S. 224, 227 n. 4 (1972); *Mancusi* v. *DeForte,* 392 U. S. 364, 368 n. 5 (1968); *Simmons* v. *United States, supra,* at 390. Had the Court intended to adopt the target theory now put forth by petitioners, neither of the above two holdings would have been necessary since Jones was the "target" of the police search in that case.[5] Nor does *United States* v. *Jeffers, supra,* or

---

[4] We have not yet had occasion to decide whether the automatic-standing rule of *Jones* survives our decision in *Simmons* v. *United States,* 390 U. S. 377 (1968). See *Brown* v. *United States,* 411 U. S. 223, 228–229 (1973). Such a rule is, of course, one which may allow a defendant to assert the Fourth Amendment rights of another.

[5] The search of the apartment in *Jones* was pursuant to a search warrant naming Jones and another woman as occupants of the apartment. The affidavit submitted in support of the search warrant alleged that Jones and

*Bumper* v. *North Carolina, supra,* support the target theory. Standing in *Jeffers* was based on Jeffers' possessory interest in both the premises searched and the property seized. 342 U. S., at 49–50, 54; see *Mancusi* v. *DeForte, supra,* at 367–368; *Hoffa* v. *United States,* 385 U. S. 293, 301 (1966); *Lanza* v. *New York,* 370 U. S. 139, 143, and n. 10 (1962). Similarly, in *Bumper,* the defendant had a substantial possessory interest in both the house searched and the rifle seized. 391 U. S., at 548 n. 11.

*In Alderman* v. *United States,* Mr. Justice Fortas, in a concurring and dissenting opinion, argued that the Court should "include within the category of those who may object to the introduction of illegal evidence 'one against whom the search was directed.'" 394 U. S., at 206–209. The Court did not directly comment on Mr. Justice Fortas' suggestion, but it left no doubt that it rejected this theory by holding that persons who were not parties to unlawfully overheard conversations or who did not own the premises on which such conversations took place did not have standing to contest the legality of the surveillance, regardless of whether or not they were the "targets" of the surveillance. *Id.,* at 176. Mr. Justice Harlan, concurring and dissenting, did squarely address Mr. Justice Fortas' arguments and declined to accept them. *Id.,* at 188–189, n. 1. He identified administrative problems posed by the target theory:

> "[T]he [target] rule would entail very substantial administrative difficulties. In the majority of cases, I would imagine that the police plant a bug with the expectation that it may well produce leads to a large number of crimes. A lengthy hearing would, then, appear to be necessary in order to determine whether the police knew of an accused's criminal activity at the time the bug was

---

the woman were involved in illicit narcotics traffic and kept a supply of heroin and narcotics paraphernalia in the apartment. 362 U. S., at 267–269, and n. 2; App. in *Jones* v. *United States,* O. T. 1959, No. 69, p. 1.

planted and whether the police decision to plant a bug was motivated by an effort to obtain information against the accused or some other individual. I do not believe that this administrative burden is justified in any substantial degree by the hypothesized marginal increase in Fourth Amendment protection." *Ibid.*

When we are urged to grant standing to a criminal defendant to assert a violation, not of his own constitutional rights but of someone else's, we cannot but give weight to practical difficulties such as those foreseen by Mr. Justice Harlan in the quoted language.

Conferring standing to raise vicarious Fourth Amendment claims would necessarily mean a more widespread invocation of the exclusionary rule during criminal trials. The Court's opinion in *Alderman* counseled against such an extension of the exclusionary rule:

"The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Id.,* at 174–175.

Each time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected. See *United States* v. *Ceccolini,* 435 U. S. 268, 275 (1978); *Stone* v. *Powell,* 428 U. S. 465, 489–490 (1976); *United States* v. *Calandra,* 414 U. S., at 348–352. Since our cases generally

have held that one whose Fourth Amendment rights are violated may successfully suppress evidence obtained in the course of an illegal search and seizure, misgivings as to the benefit of enlarging the class of persons who may invoke that rule are properly considered when deciding whether to expand standing to assert Fourth Amendment violations.[6]

## B

Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain *Jones'* use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," *Simmons* v. *United States,* 390 U. S., at 389, the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth

---

[6] For these same prudential reasons, the Court in *Alderman* v. *United States* rejected the argument that *any* defendant should be enabled to apprise the court of unconstitutional searches and seizures and to exclude all such unlawfully seized evidence from trial, regardless of whether his Fourth Amendment rights were violated by the search *or* whether he was the "target" of the search. This expansive reading of the Fourth Amendment also was advanced by the petitioner in *Jones* v. *United States* and implicitly rejected by the Court. Brief for Petitioner in *Jones* v. *United States,* O. T. 1959, No. 69, pp. 21–25.

Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in *Jones* and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same.[7] But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in *Jones* also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U. S., at 261, 263, 265.

It should be emphasized that nothing we say here casts the least doubt on cases which recognize that, as a general proposition, the issue of standing involves two inquiries: first, whether the proponent of a particular legal right has alleged "injury in fact," and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties. See, *e. g., Singleton* v. *Wulff,* 428 U. S. 106, 112 (1976) ; *Warth* v. *Seldin,*

---

[7] So, for example, in *Katz* v. *United States,* 389 U. S. 347, 352 (1967), the Court focused on substantive Fourth Amendment law, concluded that a person in a telephone booth "may rely upon the protection of the Fourth Amendment," and then proceeded to determine whether the search was "unreasonable." In *Mancusi* v. *DeForte,* 392 U. S. 364 (1968), on the other hand, the Court concentrated on the issue of standing, decided that the defendant possessed it, and with barely any mention of the threshold substantive question of whether the search violated DeForte's own Fourth Amendment rights, went on to decide whether the search was "unreasonable." In both cases, however, the first inquiry was much the same.

422 U. S. 490, 499 (1975); *Data Processing Service* v. *Camp,* 397 U. S. 150, 152–153 (1970). But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing. Cf. *id.,* at 153, and n. 1; *Barrows* v. *Jackson,* 346 U. S. 249, 256 n. 4 (1953); *Hale* v. *Henkel,* 201 U. S. 43, 69–70 (1906).[8]

Analyzed in these terms, the question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. We are under no illusion that by dispensing with the rubric of standing used in *Jones* we have rendered any simpler the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure. But by frankly recognizing that this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing, we think the decision of this issue will rest on sounder logical footing.

## C

Here petitioners, who were passengers occupying a car which they neither owned nor leased, seek to analogize their position to that of the defendant in *Jones* v. *United States.*

---

[8] This approach is consonant with that which the Court already has taken with respect to the Fifth Amendment privilege against self-incrimination, which also is a purely personal right. See, *e. g., Bellis* v. *United States,* 417 U. S. 85, 89–90 (1974); *Couch* v. *United States,* 409 U. S. 322, 327–328 (1973); *United States* v. *White,* 322 U. S. 694, 698–699 (1944).

In *Jones,* petitioner was present at the time of the search of an apartment which was owned by a friend. The friend had given Jones permission to use the apartment and a key to it, with which Jones had admitted himself on the day of the search. He had a suit and shirt at the apartment and had slept there "maybe a night," but his home was elsewhere. At the time of the search, Jones was the only occupant of the apartment because the lessee was away for a period of several days. 362 U. S., at 259. Under these circumstances, this Court stated that while one wrongfully on the premises could not move to suppress evidence obtained as a result of searching them,[9] "anyone legitimately on premises where a search occurs may challenge its legality." *Id.,* at 267. Petitioners argue that their occupancy of the automobile in question was comparable to that of Jones in the apartment and that they therefore have standing to contest the legality of the search—or as we have rephrased the inquiry, that they, like Jones, had their Fourth Amendment rights violated by the search.

We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful.

---

[9] The Court in *Jones* was quite careful to note that "wrongful" presence at the scene of a search would not enable a defendant to object to the legality of the search. 362 U. S., at 267. The Court stated: "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. *This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." Ibid.* (emphasis added). Despite this clear statement in *Jones,* several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile. See, *e. g., Cotton* v. *United States,* 371 F. 2d 385 (CA9 1967); *Simpson* v. *United States,* 346 F. 2d 291 (CA10 1965).

Nonetheless, we believe that the phrase "legitimately on premises" coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights.[10] For example, applied literally, this statement would permit a casual visitor who has never seen, or been permitted to visit, the basement of another's house to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search. Likewise, a casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends would be able to contest the legality of the search. The first visitor would have absolutely no interest or legitimate expectation of privacy in the basement, the second would have none in the house, and it advances no purpose served by the Fourth Amendment to permit either of them to object to the lawfulness of the search.[11]

We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place. See 362 U. S., at 263,

[10] The Court in *Mancusi* v. *DeForte, supra,* also must have been unsatisfied with the "legitimately on premises" statement in *Jones.* DeForte was legitimately in his office at the time of the search and if the *Mancusi* Court had literally applied the statement from *Jones,* DeForte's standing to object to the search should have been obvious. Instead, to determine whether DeForte possessed standing to object to the search, the Court inquired into whether DeForte's office was an area "in which there was a reasonable expectation of freedom from governmental intrusion." 392 U. S., at 368; see *id.,* at 376 (Black, J., dissenting).

Unfortunately, with few exceptions, lower courts have literally applied this language from *Jones* and have held that anyone legitimately on premises at the time of the search may contest its legality. See, *e. g., Garza-Fuentes* v. *United States,* 400 F. 2d 219 (CA5 1968); *State* v. *Bresolin,* 13 Wash. App. 386, 534 P. 2d 1394 (1975).

[11] This is not to say that such visitors could not contest the lawfulness of the seizure of evidence or the search if their own property were seized during the search.

265. In defining the scope of that interest, we adhere to the view expressed in *Jones* and echoed in later cases that arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control. *Id.*, at 266; see *Mancusi* v. *DeForte*, 392 U. S. 364 (1968); *Warden* v. *Hayden*, 387 U. S. 294 (1967); *Silverman* v. *United States*, 365 U. S. 505 (1961). But the *Jones* statement that a person need only be "legitimately on premises" in order to challenge the validity of the search of a dwelling place cannot be taken in its full sweep beyond the facts of that case.

*Katz* v. *United States*, 389 U. S. 347 (1967), provides guidance in defining the scope of the interest protected by the Fourth Amendment. In the course of repudiating the doctrine derived from *Olmstead* v. *United States*, 277 U. S. 438 (1928), and *Goldman* v. *United States*, 316 U. S. 129 (1942), that if police officers had not been guilty of a common-law trespass they were not prohibited by the Fourth Amendment from eavesdropping, the Court in *Katz* held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. 389 U. S., at 353; see *United States* v. *Chadwick*, 433 U. S. 1, 7 (1977); *United States* v. *White*, 401 U. S. 745, 752 (1971). Viewed in this manner, the holding in *Jones* can best be explained by the fact that Jones had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his "interest" in those premises might not have been a recognized property interest at common law.[12] See *Jones* v. *United States*, 362 U. S., at 261.

---

[12] Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may

Our Brother WHITE in dissent expresses the view that by rejecting the phrase "legitimately on '[the] premises" as the appropriate measure of Fourth Amendment rights, we are abandoning a thoroughly workable, "bright line" test in favor of a less certain analysis of whether the facts of a particular case give rise to a legitimate expectation of privacy. *Post,*

---

have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of *Jones,* 362 U. S., at 267, is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States,* 389 U. S., at 361 (Harlan, J., concurring). And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were rejected both in *Jones, supra,* and *Katz, supra.* But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment. No better demonstration of this proposition exists than the decision in *Alderman* v. *United States,* 394 U. S. 165 (1969), where the Court held that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations. On the other hand, even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon. See *Katz, supra,* at 351; *Lewis* v. *United States,* 385 U. S. 206, 210 (1966); *United States* v. *Lee,* 274 U. S. 559, 563 (1927); *Hester* v. *United States,* 265 U. S. 57, 58–59 (1924).

at 168. If "legitimately on premises" were the successful litmus test of Fourth Amendment rights that he assumes it is, his approach would have at least the merit of easy application, whatever it lacked in fidelity to the history and purposes of the Fourth Amendment. But a reading of lower court cases that have applied the phrase "legitimately on premises," and of the dissent itself, reveals that this expression is not a shorthand summary for a bright-line rule which somehow encapsulates the "core" of the Fourth Amendment's protections.[13]

---

[13] An examination of lower court decisions shows that use of this purported "bright line" test has led to widely varying results. For example, compare *United States* v. *Westerbann-Martinez,* 435 F. Supp. 690 (EDNY 1977) (defendant has standing to object to search of co-defendant's *person* at airport because defendant was lawfully present at time of search), with *Sumrall* v. *United States,* 382 F. 2d 651 (CA10 1967), cert. denied, 389 U. S. 1055 (1968) (defendant did not have standing to object to search of codefendant's purse even though defendant present at time of search). Compare *Holloway* v. *Wolff,* 482 F. 2d 110 (CA8 1973) (defendant has standing to object to search of bedroom in house of third person because lawfully in house at time of search even though no showing that defendant had ever been given permission to use, or had ever been in, bedroom), with *Northern* v. *United States,* 455 F. 2d 427 (CA9 1972) (defendant lacked standing to object to search of apartment-mate's bedroom even though present in apartment at time of search since no showing that defendant had permission to enter or use roommate's bedroom), and *United States* v. *Miller,* 145 U. S. App. D. C. 312, 449 F. 2d 974 (1971) (defendant lawfully present in third person's office has standing to object to police entry into office since lawfully present but lacks standing to object to search of drawer of third person's desk since no showing that he had permission to open or use drawer). Compare *United States* v. *Tussell,* 441 F. Supp. 1092 (MD Pa. 1977) (lessee does not have standing because not present at time of search), with *United States* v. *Potter,* 419 F. Supp. 1151 (ND Ill. 1976) (lessee has standing even though not present when premises searched). Compare *United States* v. *Fernandez,* 430 F. Supp. 794 (ND Cal. 1976) (defendant with authorized access to apartment has standing even though not present at time of search), with *United States* v. *Potter, supra* (defendants with authorized access to premises lack standing because not present at the time of the search). Compare *United States* v. *Delguyd,* 542 F. 2d 346 (CA6 1976)

The dissent itself shows that the facile consistency it is striving for is illusory. The dissenters concede that "there comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion." *Post,* at 164. But surely the "point" referred to is not one demarcating a line which is black on one side and white on another; it is inevitably a point which separates one shade of gray from another. We are likewise told by the dissent that a person "legitimately on *private* premises . . . , though his privacy is *not absolute,* is entitled to expect that he is sharing it only with those persons [allowed there] and that governmental officials will intrude only with *consent* or by complying with the Fourth Amendment." *Ibid.* (emphasis added). This single sentence describing the contours of the supposedly easily applied rule virtually abounds with unanswered questions: What are "private" premises? Indeed, what are the "premises?" It may be easy to describe the "premises" when one is confronted with a 1-room apartment, but what of the case of a 10-room house, or of a house with an attached garage that is searched? Also, if one's privacy is not absolute, how is it bounded? If he risks governmental intrusion "with consent," who may give that consent?

Again, we are told by the dissent that the Fourth Amendment assures that "*some* expectations of privacy are justified and will be protected from official intrusion." *Post,* at 166 (emphasis added). But we are not told which of many possible expectations of privacy are embraced within this sentence. And our dissenting Brethren concede that "perhaps the Constitution provides some degree less protection for the

(defendant stopped by police in parking lot of apartment house which he intended to visit lacks standing to object to subsequent search of apartment since not present in apartment at time of search), with *United States* v. *Fay,* 225 F. Supp. 677 (SDNY 1963), rev'd on other grounds, 333 F. 2d 28 (CA2 1964) (defendant-invitee stopped in hallway of apartment building has standing to object to search of apartment he intended to visit).

personal freedom from unreasonable governmental intrusion when one does not have a possessory interest in the invaded private place." *Ibid.* But how much "less" protection is available when one does not have such a possessory interest?

Our disagreement with the dissent is not that it leaves these questions unanswered, or that the questions are necessarily irrelevant in the context of the analysis contained in this opinion. Our disagreement is rather with the dissent's bland and self-refuting assumption that there will not be fine lines to be drawn in Fourth Amendment cases as in other areas of the law, and that its rubric, rather than a meaningful exegesis of Fourth Amendment doctrine, is more desirable or more easily resolves Fourth Amendment cases.[14] In abandoning "legitimately on premises" for the doctrine that we announce today, we are not forsaking a time-tested and workable rule, which has produced consistent results when applied, solely for the sake of fidelity to the values underlying the Fourth Amendment. Rather, we are rejecting blind adherence to a phrase which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth Amendment. Where the factual premises for a rule are so generally prevalent that little would be lost and much would be gained by abandoning case-by-case analysis, we have not hesitated to do so. See *United States* v. *Robinson,* 414 U. S. 218, 235 (1973). But the phrase "legiti-

[14] Commentators have expressed similar dissatisfaction with reliance on "legitimate presence" to resolve Fourth Amendment questions. Trager & Lobenfeld, The Law of Standing Under the Fourth Amendment, 41 Brooklyn L. Rev. 421, 448 (1975); White & Greenspan, Standing to Object to Search and Seizure, 118 U. Pa. L. Rev. 333, 344–345 (1970). And, as we earlier noted, *supra,* at 142 n. 10, the Court in *Mancusi* v. *DeForte,* 392 U. S. 364 (1968), also implicitly recognized that the phrase "legitimately on premises" simply does not answer the question whether the search violated a defendant's "reasonable expectation of freedom from governmental intrusion." See *id.,* at 368.

mately on premises" has not been shown to be an easily applicable measure of Fourth Amendment rights so much as it has proved to be simply a label placed by the courts on results which have not been subjected to careful analysis. We would not wish to be understood as saying that legitimate presence on the premises is irrelevant to one's expectation of privacy, but it cannot be deemed controlling.

### D

Judged by the foregoing analysis, petitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized. And as we have previously indicated, the fact that they were "legitimately on [the] premises" in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched. It is unnecessary for us to decide here whether the same expectations of privacy are warranted in a car as would be justified in a dwelling place in analogous circumstances. We have on numerous occasions pointed out that cars are not to be treated identically with houses or apartments for Fourth Amendment purposes. See *United States* v. *Chadwick,* 433 U. S., at 12; *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 561 (1976); *Cardwell* v. *Lewis,* 417 U. S. 583, 590 (1974) (plurality opinion).[15] But here petitioners' claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a

---

[15] As we noted in *Martinez-Fuerte,* "[o]ne's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." 428 U. S., at 561.

passenger *qua* passenger simply would not normally have a legitimate expectation of privacy. *Supra,* at 142.

*Jones* v. *United States,* 362 U. S. 257 (1960) and *Katz* v. *United States,* 389 U. S. 347 (1967), involved significantly different factual circumstances. Jones not only had permission to use the apartment of his friend, but had a key to the apartment with which he admitted himself on the day of the search and kept possessions in the apartment. Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it. Likewise in *Katz,* the defendant occupied the telephone booth, shut the door behind him to exclude all others and paid the toll, which "entitled [him] to assume that the words he utter[ed] into the mouthpiece [would] not be broadcast to the world." *Id.,* at 352.[16] Katz and Jones could legitimately expect privacy in the areas which were the subject of the search and seizure each sought to contest. No such showing was made by these petitioners with respect to those portions of the automobile which were searched and from which incriminating evidence was seized.[17]

---

[16] The dissent states that *Katz* v. *United States* expressly recognized protection for passengers of taxicabs and asks why that protection should not also extend to these petitioners. *Katz* relied on *Rios* v. *United States,* 364 U. S. 253 (1960), as support for that proposition. The question of Rios' right to contest the search was not presented to or addressed by the Court and the property seized appears to have belonged to Rios. See *United States* v. *Jeffers,* 342 U. S. 48 (1951). Additionally, the facts of that case are quite different from those of the present case. Rios had hired the cab and occupied the rear passenger section. When police stopped the cab, he placed a package he had been holding on the floor of the rear section. The police saw the package and seized it after defendant was removed from the cab.

[17] For reasons which they do not explain, our dissenting Brethren repeatedly criticize our "holding" that unless one has a common-law property interest in the premises searched, one cannot object to the search. We have rendered no such "holding," however. To the contrary, we have taken pains to reaffirm the statements in *Jones* and *Katz* that "arcane

## III

The Illinois courts were therefore correct in concluding that it was unnecessary to decide whether the search of the car might have violated the rights secured to someone else by the Fourth and Fourteenth Amendments to the United States Constitution. Since it did not violate any rights of these petitioners, their judgment of conviction is

*Affirmed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

I concur in the opinion of the Court, and add these thoughts. I do not believe my dissenting Brethren correctly characterize the rationale of the Court's opinion when they assert that it ties "the application of the Fourth Amendment . . . to property law concepts." *Post,* at 156–157. On the contrary, I read the Court's opinion as focusing on whether there was a *legitimate* expectation of privacy protected by the Fourth Amendment.

The petitioners do not challenge the constitutionality of the police action in stopping the automobile in which they

---

distinctions developed in property . . . law . . . ought not to control." *Supra,* at 143, and n. 12. In a similar vein, the dissenters repeatedly state or imply that we now "hold" that a passenger lawfully in an automobile "may not invoke the exclusionary rule and challenge a search of that vehicle unless he happens to own or have a possessory interest in it." *Post,* at 156, 158–159, 163, 165, 166, 168, 168–169. It is not without significance that these statements of today's "holding" come from the dissenting opinion, and not from the Court's opinion. The case before us involves the search of and seizure of property from the glove compartment and area under the seat of a car in which petitioners were riding as passengers. Petitioners claimed only that they were "legitimately on [the] premises" and did not claim that they had any legitimate expectation of privacy in the areas of the car which were searched. We cannot, therefore, agree with the dissenters' insistence that our decision will encourage the police to violate the Fourth Amendment. *Post,* at 168–169.

were riding; nor do they complain of being made to get out of the vehicle. Rather, petitioners assert that their constitutionally protected interest in privacy was violated when the police, after stopping the automobile and making them get out, searched the vehicle's interior, where they discovered a sawed-off rifle under the front seat and rifle shells in the locked glove compartment. The question before the Court, therefore, is a narrow one: Did the search of their friend's automobile after they had left it violate any Fourth Amendment right of the petitioners?

The dissenting opinion urges the Court to answer this question by considering only the talisman of legitimate presence on the premises. To be sure, one of the two alternative reasons given by the Court for its ruling in *Jones* v. *United States,* 362 U. S. 257 (1960), was that the defendant had been legitimately on the premises searched. Since *Jones,* however, the view that mere legitimate presence is enough to create a Fourth Amendment right has been questioned. See *ante,* at 147 n. 14. There also has been a signal absence of uniformity in the application of this theory. See *ante,* at 145–146 n. 13.

This Court's decisions since *Jones* have emphasized a sounder standard for determining the scope of a person's Fourth Amendment rights: Only legitimate expectations of privacy are protected by the Constitution. In *Katz* v. *United States,* 389 U. S. 347 (1967), the Court rejected the notion that the Fourth Amendment protects places or property, ruling that the scope of the Amendment must be determined by the scope of privacy that a free people legitimately may expect. See *id.,* at 353. As Mr. Justice Harlan pointed out in his concurrence, however, it is not enough that an individual desired or anticipated that he would be free from governmental intrusion. Rather, for an expectation to deserve the protection of the Fourth Amendment, it must "be one that society is prepared to recognize as 'reasonable.'" See *id.,* at 361.

The ultimate question, therefore, is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances. As the dissenting opinion states, this standard "will not provide law enforcement officials with a bright line between the protected and the unprotected." See *post,* at 168. Whatever the application of this standard may lack in ready administration, it is more faithful to the purposes of the Fourth Amendment than a test focusing solely or primarily on whether the defendant was legitimately present during the search.[1]

In considering the reasonableness of asserted privacy expectations, the Court has recognized that no single factor invariably will be determinative. Thus, the Court has examined whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy—that is, precautions customarily taken by those seeking privacy. See, *e. g., United States* v. *Chadwick,* 433 U. S. 1, 11 (1977) ("By placing personal effects inside a double-

---

[1] Allowing anyone who is legitimately on the premises searched to invoke the exclusionary rule extends the rule far beyond the proper scope of Fourth Amendment protections, as not all who are legitimately present invariably have a reasonable expectation of privacy. And, as the Court points out, the dissenters' standard lacks even the advantage of easy application. See *ante,* at 145–146.

I do not share the dissenters' concern that the Court's ruling will "invit[e] police to engage in patently unreasonable searches every time an automobile contains more than one occupant." See *post,* at 168. A police officer observing an automobile carrying several passengers will not know the circumstances surrounding each occupant's presence in the automobile, and certainly will not know whether an occupant will be able to establish that he had a reasonable expectation of privacy. Thus, there will continue to be a significant incentive for the police to comply with the requirements of the Fourth Amendment, lest otherwise valid prosecutions be voided. Moreover, any marginal diminution in this incentive that might result from the Court's decision today is more than justified by society's interest in restricting the scope of the exclusionary rule to those cases where in fact there is a reasonable expectation of privacy.

locked footlocker, respondents manifested an expectation that the contents would remain free from public examination"); *Katz* v. *United States, supra,* at 352 ("One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world"). Similarly, the Court has looked to the way a person has used a location, to determine whether the Fourth Amendment should protect his expectations of privacy. In *Jones* v. *United States, supra,* for example, the Court found that the defendant had a Fourth Amendment privacy interest in an apartment in which he had slept and in which he kept his clothing. The Court on occasion also has looked to history to discern whether certain types of government intrusion were perceived to be objectionable by the Framers of the Fourth Amendment. See *United States* v. *Chadwick, supra,* at 7–9. And, as the Court states today, property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable. See *Alderman* v. *United States,* 394 U. S. 165 (1969).

The Court correctly points out that petitioners cannot invoke decisions such as *Alderman* in support of their Fourth Amendment claim, as they had no property interest in the automobile in which they were riding. But this determination is only part of the inquiry required under *Katz.* The petitioners' Fourth Amendment rights were not abridged here because none of the factors relied upon by this Court on prior occasions supports petitioners' claim that their alleged expectation of privacy from government intrusion was *reasonable.*

We are concerned here with an automobile search. Nothing is better established in Fourth Amendment jurisprudence than the distinction between one's expectation of privacy in

an automobile and one's expectation when in other locations.[2] We have repeatedly recognized that this expectation in "an automobile . . . [is] significantly different from the traditional expectation of privacy and freedom in one's residence." *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 561 (1976). In *United States* v. *Chadwick, supra,* at 12, the distinction was stated more broadly:

> "[T]his Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts. *Carroll* v. *United States,* 267 U. S. 132 (1925); *Preston* v. *United States,* [376 U. S. 364,] 366–367 [(1964)]; *Chambers* v. *Maroney,* 399 U. S. 42 (1970). See also *South Dakota* v. *Opperman,* 428 U. S. 364, 367 (1976)." [3]

In *Chadwick,* the Court recognized a reasonable expectation of privacy with respect to one's locked footlocker, and rejected the Government's argument that luggage always should be equated with motor vehicles for Fourth Amendment purposes. 433 U. S., at 13.

A distinction also properly may be made in some circumstances between the Fourth Amendment rights of passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments. In *South Dakota* v. *Opperman,* 428 U. S. 364 (1976), for example, we

---

[2] There are sound reasons for this distinction: Automobiles operate on public streets; they are serviced in public places; they stop frequently; they are usually parked in public places; their interiors are highly visible; and they are subject to extensive regulation and inspection. The rationale of the automobile distinction does not apply, of course, to objects on the person of an occupant.

[3] Six Members of the Court joined THE CHIEF JUSTICE in *Chadwick,* and the two Justices who dissented in *Chadwick* did not disagree with the automobile distinction.

considered "the citizen's interest in the privacy of the contents of his automobile" where its doors were locked and windows rolled up. See *id.*, at 379 (POWELL J., concurring). Here there were three passengers and a driver in the automobile searched. None of the passengers is said to have had control of the vehicle or the keys. It is unrealistic—as the shared experience of us all bears witness—to suggest that these passengers had any reasonable expectation that the car in which they had been riding would not be searched after they were lawfully stopped and made to get out. The minimal privacy that existed simply is not comparable to that, for example, of an individual in his place of abode, see *Jones* v. *United States, supra;* of one who secludes himself in a telephone booth, *Katz* v. *United States, supra;* or of the traveler who secures his belongings in a locked suitcase or footlocker. See *United States* v. *Chadwick, supra.*[4]

This is not an area of the law in which any "bright line" rule would safeguard both Fourth Amendment rights and the

[4] The sawed-off rifle in this case was merely pushed beneath the front seat, presumably by one of the petitioners. In that position, it could have slipped into full or partial view in the event of an accident, or indeed upon any sudden stop. As the rifle shells were in the locked glove compartment, this might have presented a closer case if it had been shown that one of the petitioners possessed the keys or if a rifle had not been found in the automobile.

The dissenting opinion suggests that the petitioners here took the same actions to preserve their privacy as did the defendant in *Katz:* Just as Katz closed the door to the telephone booth after him, petitioners closed the doors to their automobile. See *post,* at 165 n. 15. Last Term, this Court determined in *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977), that passengers in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made. The dissenting opinion concedes that there is no question here of the propriety of the stopping of the automobile in which the petitioners were riding. See *post,* at 160 n. 5. Thus, the closing of the doors of a vehicle, even if there were only one occupant, cannot have the same significance as it might in other contexts.

public interest in a fair and effective criminal justice system. The range of variables in the fact situations of search and seizure is almost infinite. Rather than seek facile solutions, it is best to apply principles broadly faithful to Fourth Amendment purposes. I believe the Court has identified these principles.[5]

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The Court today holds that the Fourth Amendment protects property, not people, and specifically that a legitimate occupant of an automobile may not invoke the exclusionary rule and challenge a search of that vehicle unless he happens to own or have a possessory interest in it.[1] Though professing to acknowledge that the primary purpose of the Fourth Amendment's prohibition of unreasonable searches is the protection of privacy—not property—the Court nonetheless effectively ties the application of the Fourth Amendment and

---

[5] Even if one agreed with my dissenting Brethren that there was a Fourth Amendment violation in this case, the evidence seized would have been admissible under the modification of the exclusionary rule proposed by MR. JUSTICE WHITE in his dissenting opinion in *Stone* v. *Powell*, 428 U. S. 465, 538 (1976):

"[T]he rule should be substantially modified so as to prevent its application in those many circumstances where the evidence at issue was seized by an officer acting in the good-faith belief that his conduct comported with existing law and having reasonable grounds for this belief. These are recurring situations; and recurringly evidence is excluded without any realistic expectation that its exclusion will contribute in the slightest to the purposes of the rule, even though the trial will be seriously affected or the indictment dismissed."

See also *Brown* v. *Illinois*, 422 U. S. 590, 609–610 (1975) (POWELL, J., concurring in part).

[1] For the most part, I agree with the Court's rejection, which was implicit in *Alderman* v. *United States*, 394 U. S. 165 (1969), of petitioners' secondary theory of target standing.

the exclusionary rule in this situation to property law concepts. Insofar as passengers are concerned, the Court's opinion today declares an "open season" on automobiles. However unlawful stopping and searching a car may be, absent a possessory or ownership interest, no "mere" passenger may object, regardless of his relationship to the owner. Because the majority's conclusion has no support in the Court's controlling decisions, in the logic of the Fourth Amendment, or in common sense, I must respectfully dissent. If the Court is troubled by the practical impact of the exclusionary rule, it should face the issue of that rule's continued validity squarely instead of distorting other doctrines in an attempt to reach what are perceived as the correct results in specific cases. Cf. *Stone* v. *Powell*, 428 U. S. 465, 536 (1976) (WHITE, J., dissenting).

I

Two intersecting doctrines long established in this Court's opinions control here. The first is the recognition of some cognizable level of privacy in the interior of an automobile. Though the reasonableness of the expectation of privacy in a vehicle may be somewhat weaker than that in a home, see *United States* v. *Chadwick*, 433 U. S. 1, 12–13 (1977), "[a] search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search." *United States* v. *Ortiz*, 422 U. S. 891, 896 (1975) (footnote omitted). So far, the Court has not strayed from this application of the Fourth Amendment.[2]

The second tenet is that when a person is legitimately present in a private place, his right to privacy is protected from unreasonable governmental interference even if he does

---

[2] See *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 269 (1973) ("Automobile or no automobile, there must be probable cause for the search").

not own the premises. Just a few years ago, THE CHIEF JUSTICE, for a unanimous Court, wrote that the "[p]resence of the defendant at the search and seizure was held, in *Jones,* to be a sufficient source of standing in itself." *Brown* v. *United States,* 411 U. S. 223, 227 n. 2 (1973); accord, *id.,* at 229 (one basis for Fourth Amendment protection is presence "on the premises at the time of the contested search and seizure"); *Jones* v. *United States,* 362 U. S. 257 (1960) (individual legitimately present in friend's apartment may object to search of apartment). *Brown* was not the first time we had recognized that *Jones* established the rights of one legitimately in a private area against unreasonable governmental intrusion. *E. g., Combs* v. *United States,* 408 U. S. 224, 227, and n. 4 (1972); *Mancusi* v. *DeForte,* 392 U. S. 364, 368, and n. 5 (1968); *Simmons* v. *United States,* 390 U. S. 377, 390 (1968). The Court in *Jones* itself was unanimous in this regard, and its holding is not the less binding because it was an alternative one. See *Combs* v. *United States, supra,* at 227 n. 4.

These two fundamental aspects of Fourth Amendment law demand that petitioners be permitted to challenge the search and seizure of the automobile in this case. It is of no significance that a car is different for Fourth Amendment purposes from a house, for if there is some protection for the privacy of an automobile then the only relevant analogy is between a person legitimately in someone else's vehicle and a person legitimately in someone else's home. If both strands of the Fourth Amendment doctrine adumbrated above are valid, the Court must reach a different result. Instead, it chooses to eviscerate the *Jones* principle, an action in which I am unwilling to participate.

II

Though we had reserved the very issue over 50 years ago, see *Carroll* v. *United States,* 267 U. S. 132, 162 (1925), and never expressly dealt with it again until today, many of our opinions have assumed that a mere passenger in an automo-

bile is entitled to protection against unreasonable searches occurring in his presence. In decisions upholding the validity of automobile searches, we have gone directly to the merits even though some of the petitioners did not own or possess the vehicles in question. *E. g., Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973) (sole petitioner was not owner; in fact, owner was not in the automobile at all); *Chambers* v. *Maroney,* 399 U. S. 42 (1970) (sole petitioner was not owner); *Husty* v. *United States,* 282 U. S. 694 (1931). In *Dyke* v. *Taylor Implement Mfg. Co.,* 391 U. S. 216 (1968), the Court, with seven Members agreeing, upset the admission of evidence against three petitioners though only one owned the vehicle. See *id.,* at 221–222. Similarly, in *Preston* v. *United States,* 376 U. S. 364 (1964), the Court unanimously overturned a search though the single petitioner was not the owner of the automobile. The Court's silence on this issue in light of its actions can only mean that, until now, we, like most lower courts,[3] had assumed that *Jones* foreclosed the answer now supplied by the majority. That assumption was perfectly understandable, since all private premises would seem to be the same for the purposes of the analysis set out in *Jones.*

## III

The logic of Fourth Amendment jurisprudence compels the result reached by the above decisions. Our starting point is "[t]he established principle . . . that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself . . . ." *Alderman* v. *United States,* 394 U. S. 165, 171–172 (1969).[4] Though the Amendment protects one's liberty

---

[3] *E. g., United States* v. *Edwards,* 577 F. 2d 883 (CA5 1978) (en banc); *Bustamonte* v. *Schneckloth,* 448 F. 2d 699 (CA9 1971), rev'd on other grounds, 412 U. S. 218 (1973); *United States* v. *Peisner,* 311 F. 2d 94 (CA4 1962).

[4] Accord, *Simmons* v. *United States,* 390 U. S. 377, 389 (1968) ("[W]e have . . . held that rights assured by the Fourth Amendment are personal

and property interests against unreasonable seizures of self[5] and effects,[6] "the primary object of the Fourth Amendment [is] . . . the protection of privacy." *Cardwell* v. *Lewis,* 417 U. S. 583, 589 (1974) (plurality opinion).[7] And privacy is the

---

rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure").

[5] See *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest"); *Terry* v. *Ohio,* 392 U. S. 1 (1968).

Thus, petitioners of course have standing to challenge the legality of the stop, and the evidence found may be a fruit of that stop. See *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 548, 556 (1976). Petitioners have not argued that theory here, perhaps because the justification necessary for such a stop is less than that needed for a search. See *Terry* v. *Ohio, supra.* Nor have petitioners chosen to argue that they were "arrested" in constitutional terms as soon as they were ordered from the vehicle and that the search was a fruit of that infringement on their personal rights.

[6] See *United States* v. *Lisk,* 522 F. 2d 228 (CA7 1975), cert. denied, 423 U. S. 1078 (1976) (noted in 64 Geo. L. J. 1187 (1976)), after remand, 559 F. 2d 1108 (CA7 1977).

Petitioners never asserted a property interest in the items seized from the automobile. The evidence found was useful to the prosecution solely on the theory that petitioners' possession of the items was probative of petitioners' identity as the robbers. In *Jones* the Court recognized automatic standing in possessory crimes because the prosecution should not be allowed to take contradictory positions in the suppression hearing and then at trial, and also because of the dilemma that the defendant would face if he were forced to assert possession to challenge a search. 362 U. S., at 263. In *Simmons* we eliminated the dilemma by holding that the accused's testimony at the suppression hearing could not be used against him at trial. 390 U. S., at 394. We also noted that the question whether automatic standing should be recognized for possessory evidence in nonpossessory crimes was an open one. *Id.,* at 391–392. Finally, in *Brown* v. *United States,* 411 U. S. 223, 229 (1973), we reserved the question whether prosecutorial self-contradiction by itself warrants automatic standing.

[7] See *United States* v. *Chadwick,* 433 U. S. 1, 7 (1977).

interest asserted here,[8] so the first step is to ascertain whether the premises searched "fall within a protected zone of privacy." *United States* v. *Miller,* 425 U. S. 435, 440 (1976). My Brethren in the majority assertedly do not deny that automobiles warrant at least some protection from official interference with privacy. Thus, the next step is to decide who is entitled, vis-à-vis the State, to enjoy that privacy. The answer to that question must be found by determining "whether petitioner had an interest in connection with the searched premises that gave rise to 'a reasonable expectation [on his part] of freedom from governmental intrusion' upon those premises." *Combs* v. *United States,* 408 U. S., at 227, quoting *Mancusi* v. *DeForte,* 392 U. S., at 368 (bracketed material in original).

Not only does *Combs* supply the relevant inquiry, it also directs us to the proper answer. We recognized there that *Jones* had held that one of those protected interests is created by legitimate presence on the searched premises, even absent any possessory interest. 408 U. S., at 227 n. 4. This makes unquestionable sense. We have concluded on numerous occasions that the entitlement to an expectation of privacy does not hinge on ownership:

> "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz* v. *United States,* 389 U. S. 347, 351–352 (1967).

In *Alderman* v. *United States, supra,* at 196, Mr. Justice Harlan, concurring in part and dissenting in part, noted that "our own past decisions . . . have decisively rejected the no-

---

[8] See *Cardwell* v. *Lewis,* 417 U. S., at 591 (plurality opinion) ("[I]nsofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our inquiry").

tion that the accused must necessarily have a possessory interest in the premises before he may assert a Fourth Amendment claim." That rejection should not have been surprising in light of our conclusion as early as 1960 that "it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." *Jones* v. *United States*, 362 U. S., at 266.[9] The proposition today overruled was stated most directly in *Mancusi* v. *De-Forte, supra*, at 368: "[T]he protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

Prior to *Jones*, the lower federal courts had based Fourth Amendment rights upon possession or ownership of the items seized or the premises searched.[10] But *Jones* was foreshadowed by Mr. Justice Jackson's remark in 1948 that "even a guest may expect the shelter of the rooftree he is under against criminal intrusion." *McDonald* v. *United States*, 335 U. S. 451, 461 (1948) (Jackson, J., joined by Frankfurter, J., concurring). Indeed, the decision today is contrary to Mr. Justice Brandeis' dissent in *Olmstead* v. *United States*, 277

---

[9] Accord, *id.*, at 589 ("The common-law notion that a warrant to search and seize is dependent upon the assertion of a superior government interest in property, . . . and the proposition that a warrant is valid 'only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it,' . . . were explicitly rejected as controlling Fourth Amendment considerations in *Warden* v. *Hayden*, 387 U. S. 294, 302–306 (1967)").

[10] Knox, Some Thoughts on the Scope of the Fourth Amendment and Standing to Challenge Searches and Seizures, 40 Mo. L. Rev. 1, 36 n. 238 (1975).

U. S. 438, 478 (1928), expressing a view of the Fourth Amendment thought to have been vindicated by *Katz*. The majority in *Olmstead* found the Fourth Amendment inapplicable absent a trespass on property rights. 277 U. S., at 466. That is exactly what the Court holds in this case; but Mr. Justice Brandeis asserted 50 years ago that more than mere property rights are involved, and the Court's opinion in *Katz* re-emphasized that " '[t]he premise that property interests control the right of the Government to search and seize has been discredited.' " 389 U. S., at 353, quoting *Warden* v. *Hayden*, 387 U. S. 294, 304 (1967). That logic led us inescapably to the conclusion that "[n]o less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment." 389 U. S., at 352 (footnotes omitted). And if all of those situations are protected, surely a person riding in an automobile next to his friend the owner, or a child or wife with the father or spouse, must have some protection as well.

The same result is reached by tracing other lines of our Fourth Amendment decisions. If a nonowner may consent to a search merely because he is a joint user or occupant of a "premises," *Frazier* v. *Cupp*, 394 U. S. 731, 740 (1969),[11] then that same nonowner must have a protected privacy interest. The scope of the authority sufficient to grant a valid consent can hardly be broader than the contours of protected privacy.[12]

---

[11] See also *United States* v. *Matlock*, 415 U. S. 164, 169, and 171 n. 7 (1974) ("The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched").

[12] Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L. Rev. 47, 54 (1974).

And why should the owner of a vehicle be entitled to challenge the seizure from it of evidence even if he is absent at the time of the search, see *Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971), while a nonowner enjoying in person, and with the owner's permission, the privacy of an automobile is not so entitled?

In sum, one consistent theme in our decisions under the Fourth Amendment has been, until now, that "the Amendment does not shield only those who have title to the searched premises." *Mancusi* v. *DeForte,* 392 U. S., at 367. Though there comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion, see *id.,* at 377 (WHITE, J., dissenting); *Air Pollution Variance Bd.* v. *Western Alfalfa Corp.,* 416 U. S. 861, 865 (1974), short of that limit a person legitimately on private premises knows the others allowed there and, though his privacy is not absolute, is entitled to expect that he is sharing it only with those persons and that governmental officials will intrude only with consent or by complying with the Fourth Amendment. See *Mancusi* v. *DeForte, supra,* at 369–370.[13]

It is true that the Court asserts that it is not limiting the Fourth Amendment bar against unreasonable searches to the protection of property rights, but in reality it is doing exactly that.[14] Petitioners were in a private place with the permis-

---

[13] See *id.,* at 52 ("The fourth amendment assures us that when we are in a private place we are, so far as the government is concerned, in private").

[14] The Court's reliance on property law concepts is additionally shown by its suggestion that visitors could "contest the lawfulness of the seizure of evidence or the search if their own property were seized during the search." *Ante,* at 142 n. 11. See also *ante,* at 149, and n. 16. What difference should that property interest make to constitutional protection against unreasonable searches, which is concerned with privacy? See *Coolidge* v. *New Hampshire,* 403 U. S. 443, 510–521 (1971) (WHITE, J., with BURGER, C. J., concurring and dissenting). Contrary to the Court's suggestion, a legitimate passenger in a car expects to enjoy the privacy of the vehicle whether or not he happens to carry some item along for the

sion of the owner, but the Court states that that is not sufficient to establish entitlement to a legitimate expectation of privacy. *Ante*, at 148. But if that is not sufficient, what would be? We are not told, and it is hard to imagine anything short of a property interest that would satisfy the majority. Insofar as the Court's rationale is concerned, no passenger in an automobile, without an ownership or possessory interest and regardless of his relationship to the owner, may claim Fourth Amendment protection against illegal stops and searches of the automobile in which he is rightfully present. The Court approves the result in *Jones,* but it fails to give any explanation why the facts in *Jones* differ, in a fashion material to the Fourth Amendment, from the facts here.[15] More importantly, how is the Court able to avoid answering the question why presence in a private place with the owner's permission is insufficient? If it is "tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases," *ante,* at 144 n. 12, then it surely must be tautological to decide that issue simply by unadorned fiat.

---

ride. We have never before limited our concern for a person's privacy to those situations in which he is in possession of personal property. Even a person living in a barren room without possessions is entitled to expect that the police will not intrude without cause.

[15] Jones had permission to use the apartment, had slept in it one night, had a key, had left a suit and a shirt there, and was the only occupant at the time of the search. *Ante,* at 141 and 149. Petitioners here had permission to be in the car and were occupying it at the time of the search. Thus the only distinguishing fact is that Jones could exclude others from the apartment by using his friend's key. But petitioners and their friend the owner had excluded others by entering the automobile and shutting the doors. Petitioners did not need a key because the owner was present. Similarly, the Court attempts to distinguish *Katz* on the theory that Katz had "shut the door behind him to exclude all others," *ante,* at 149, but petitioners here did exactly the same. The car doors remained closed until the police ordered them opened at gunpoint.

As a control on governmental power, the Fourth Amendment assures that some expectations of privacy are justified and will be protected from official intrusion. That should be true in this instance, for if protected zones of privacy can only be purchased or obtained by possession of property, then much of our daily lives will be unshielded from unreasonable governmental prying, and the reach of the Fourth Amendment will have been narrowed to protect chiefly those with possessory interests in real or personal property. I had thought that *Katz* firmly established that the Fourth Amendment was intended as more than simply a trespass law applicable to the government. Katz had no possessory interest in the public telephone booth, at least no more than petitioners had in their friend's car; Katz was simply legitimately present. And the decision in *Katz* was based not on property rights, but on the theory that it was essential to securing "conditions favorable to the pursuit of happiness" [16] that the expectation of privacy in question be recognized.[17]

At most, one could say that perhaps the Constitution provides some degree less protection for the personal freedom from unreasonable governmental intrusion when one does not have a possessory interest in the invaded private place. But that would only change the extent of the protection; it would not free police to do the unreasonable, as does the decision today. And since the accused should be entitled to litigate the application of the Fourth Amendment where his privacy interest is merely arguable,[18] the failure to allow such litigation here is the more incomprehensible.

---

[16] *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

[17] See Bacigal, Some Observations and Proposals on the Nature of the Fourth Amendment, 46 Geo. Wash. L. Rev. 529, 538 (1978).

[18] *Investment Co. Institute* v. *Camp*, 401 U. S. 617, 620 (1971); cf. *ante*, at 140.

## IV

The Court's holding is contrary not only to our past decisions and the logic of the Fourth Amendment but also to the everyday expectations of privacy that we all share. Because of that, it is unworkable in all the various situations that arise in real life. If the owner of the car had not only invited petitioners to join her but had said to them, "I give you a temporary possessory interest in my vehicle so that you will share the right to privacy that the Supreme Court says that I own," then apparently the majority would reverse. But people seldom say such things, though they may mean their invitation to encompass them if only they had thought of the problem.[19] If the nonowner were the spouse or child of the owner,[20] would the Court recognize a sufficient interest? If so, would distant relatives somehow have more of an expectation of privacy than close friends? What if the nonowner were driving with the owner's permission? Would nonowning drivers have more of an expectation of privacy than mere passengers? What about a passenger in a taxicab? *Katz* expressly recognized protection for such passengers. Why should Fourth Amendment rights be present when one pays a cabdriver for a ride but be absent when one is given a ride by a friend?

The distinctions the Court would draw are based on relationships between private parties, but the Fourth Amendment is concerned with the relationship of one of those parties to

---

[19] So far as we know, the owner of the automobile in question might have expressly granted or intended to grant exactly such an interest. Apparently not contemplating today's radical change in the law, petitioners did not know at the suppression hearing that the precise form of the invitation extended by the owner to the petitioners would be dispositive of their rights against governmental intrusion.

[20] In fact, though it was not brought out at the suppression hearing, one of the petitioners is the former husband of the owner and driver of the car. He did testify at the suppression hearing that he was with her when she purchased it.

the government. Divorced as it is from the purpose of the Fourth Amendment, the Court's essentially property-based rationale can satisfactorily answer none of the questions posed above. That is reason enough to reject it. The *Jones* rule is relatively easily applied by police and courts; the rule announced today will not provide law enforcement officials with a bright line between the protected and the unprotected.[21] Only rarely will police know whether one private party has or has not been granted a sufficient possessory or other interest by another private party. Surely in this case the officers had no such knowledge. The Court's rule will ensnare defendants and police in needless litigation over factors that should not be determinative of Fourth Amendment rights.[22]

More importantly, the ruling today undercuts the force of the exclusionary rule in the one area in which its use is most certainly justified—the deterrence of bad-faith violations of the Fourth Amendment. See *Stone* v. *Powell*, 428 U. S., at 536–542 (WHITE, J., dissenting). This decision invites police to engage in patently unreasonable searches every time an automobile contains more than one occupant. Should something be found, only the owner of the vehicle, or of the item, will have standing to seek suppression, and the evidence will

[21] Contrary to the assertions in the majority and concurring opinions, I do not agree that the Court's rule is faithful to the purposes of the Fourth Amendment but reject it only because it fails to provide a "bright line." As the discussion, *supra*, at 159–166, indicates, this dissent disagrees with the Court's view that petitioners lack a reasonable expectation of privacy. The Court's *ipse dixit* is not only unexplained but also is unjustified in light of what persons reasonably do, and should be entitled to, expect. My point in this portion of the opinion is that the Court's lack of faithfulness to the purposes of the Fourth Amendment does not have even the saving grace of providing an easily applied rule.

[22] To say that the Fourth Amendment goes beyond property rights, of course, is not to say that one not enjoying privacy in person would not be entitled to expect protection from unreasonable intrusions into the areas he owns, such as his house. *E. g.*, *Alderman* v. *United States*, 394 U. S. 165 (1969).

presumably be usable against the other occupants.[23] The danger of such bad faith is especially high in cases such as this one where the officers are only after the passengers and can usually infer accurately that the driver is the owner. The suppression remedy for those owners in whose vehicles something is found and who are charged with crime is small consolation for all those owners *and* occupants whose privacy will be needlessly invaded by officers following mistaken hunches not rising to the level of probable cause but operated on in the knowledge that someone in a crowded car will probably be unprotected if contraband or incriminating evidence happens to be found. After this decision, police will have little to lose by unreasonably searching vehicles occupied by more than one person.

Of course, most police officers will decline the Court's invitation and will continue to do their jobs as best they can in accord with the Fourth Amendment. But the very purpose of the Bill of Rights was to answer the justified fear that governmental agents cannot be left totally to their own devices, and the Bill of Rights is enforceable in the courts because human experience teaches that not all such officials will otherwise adhere to the stated precepts. Some policemen simply do act in bad faith, even if for understandable ends, and some deterrent is needed. In the rush to limit the applicability of the exclusionary rule somewhere, anywhere, the Court ignores precedent, logic, and common sense to exclude the rule's operation from situations in which, paradoxically, it is justified and needed.

---

[23] See Ingber, Procedure, Ceremony and Rhetoric: The Minimization of Ideological Conflict in Deviance Control, 56 B. U. L. Rev. 266, 304–305 (1976) (police may often be willing to risk suppression at the behest of some defendants in order to gain evidence usable against those without constitutional protection); White & Greenspan, Standing to Object to Search and Seizure, 118 U. Pa. L. Rev. 333, 349, 365 (1970) (same).