**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Osvaldo Ramon PINO (87–6129),
Silverio Juan Llera (87–6130),
Defendants–Appellants.**

**Nos. 87–6129, 87–6130.**

United States Court of Appeals,
Sixth Circuit.

Argued June 16, 1988.

Decided Aug. 31, 1988.

A.P. Walter, Jr. (argued), Daniel S. Carusi, Coral Gables, Fla., for Osvaldo Ramon Pino.

Joel C. Fanning (argued), Pensacola, Fla., for Silvero Juan Llera.

John W. Gill, U.S. Atty., Steve Cook (argued), Chattanooga, Tenn., for the U.S.

Before LIVELY and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of Tennessee denying defendants Osvaldo Ramon Pino and Silverio Juan Llera's motions to suppress evidence of approximately twelve kilograms of cocaine seized from a rented automobile driven by defendant Pino in which Llera was a passenger. Subsequent to the district court's order denying defendants' motions to suppress, defendants entered into a conditional guilty plea agreement with the United States pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, reserving the right to appeal the district court's denial of their motions to suppress. We AFFIRM.

## I. FACTUAL BACKGROUND

The bulk of the evidence presented at the suppression hearing came from Trooper Terry Thomas of the Tennessee Highway Patrol. Counsel for defendants extensively cross-examined Thomas and argued in closing that his testimony was incredible and not entirely truthful. The district court determined that Thomas and the other witnesses who testified at the hearing were truthful in every regard.

At approximately 9:30 p.m. on June 12, 1987, Thomas was traveling westbound on Interstate 24 in a marked patrol car. Thomas had recently attended a Drug Enforcement Administration seminar on drug interdiction and was acquainted with the fact that Interstate 24 is a drug corridor used by drug couriers in transporting illegal narcotics from Miami, Florida, to Chicago, Illinois. Additionally, Thomas was aware of the various characteristics of drug couriers, including their propensity to drive rented cars bearing Florida license plates and their tendency to be Hispanic.

While traveling westward on Interstate 24, Thomas came upon a station wagon bearing Florida plates driven by defendant Pino with defendant Llera in the front passenger seat.[1] Thomas recognized the vehicle as a possible rental car due to a "Z" on the license plate.

Thomas pulled alongside the station wagon. When the driver, Pino, glanced over and saw Thomas to his left, he immediately braked and swerved onto the interstate's shoulder almost hitting the guardrail. In

---

1. As their surnames indicate, both defendants are Hispanic.

his rearview mirror, Thomas saw Pino swerve back onto the freeway, without signaling, drifting partially into the left lane. Thomas slowed his squad car to thirty-five miles per hour and waited for Pino to pass. Pino did not pass, however, slowing his vehicle to avoid doing so. Thomas then pulled his patrol car off the road and stopped completely, waiting for Pino to pass. When Pino did overtake Thomas, Thomas turned on his blue lights, signaling Pino to stop.

Pino stopped his vehicle alongside the freeway, exited it, and approached Thomas on foot. Thomas noticed that Pino was visibly upset in that his hands trembled as he produced his driver's license and automobile rental contract for Thomas. Thomas noted that Pino was unusually nervous for someone stopped for a traffic violation.

Thomas examined Pino's driver's license and rental contract and noticed that they contained different addresses for Pino. He also noticed that the car had been rented at the Miami International Airport. Thomas remarked to Pino that he thought it was odd that Pino would go to the airport to rent a car in his hometown. Pino replied that the airport was the only place he could rent a car in Miami.[2]

Since the shoulder was narrow and it was raining heavily, Thomas asked Pino if he would mind driving his car down the nearby exit ramp and underneath the freeway overpass. Pino complied. Thomas retained possession of Pino's license and rental car contract during this relocation.

Upon relocating to underneath the freeway overpass, Thomas asked Pino where he was headed. Pino responded that he was going to Chicago to watch the Cubs play softball tomorrow. Thomas asked Pino if he didn't mean "baseball," and Pino became "flustered."[3] Thomas asked Pino if he was going to watch the Cubs play baseball at Wrigley Field tomorrow night, knowing that night games were not played at that stadium at that time due to the absence of lights. Pino responded affirmatively to this inquiry.

Thomas decided, at this point, to arrest Pino for the illegal lane change, rather than just giving him a citation. He did this because he did not believe that Pino would mail in the fine, given that Pino had only a transient connection with Tennessee and that he had given some suspicious responses to Thomas's questioning. Accordingly, Thomas returned to his vehicle and radioed for another patrol car, as was his routine when he made an arrest. He then proceeded to complete a citation for the improper lane change.[4] At the most, nine minutes elapsed from the time that Thomas stopped Pino on the interstate to the time Thomas decided to place Pino under arrest.

Sergeant Roy Phillips, Thomas's shift supervisor, arrived on the scene shortly thereafter in response to Thomas's call for a backup unit. Thomas apprised Phillips of the situation, and both troopers went to Pino and asked him if he would consent to a search of his vehicle. Pino refused to consent. Thomas then advised Pino that he did not have to consent but that the car would eventually be searched anyway since the troopers were going to arrest Pino for the improper lane change, tow his car, and conduct an inventory search of its contents. Pino became loud and upset at this intimation that he was going to be arrested and his rental car searched.

While Phillips remained with Pino, Thomas walked over to the rental car. As he approached, Thomas noticed that defendant Llera, who was seated inside the car, had

---

2. On appeal, Pino makes much of the fact that the Miami Airport is the only place in Miami that one can rent an Avis car after 5:00 p.m. since Pino's contract showed that he rented his car at approximately 9:00 p.m. two days prior to his arrest. According to the uncontroverted testimony of Thomas, however, Pino did not qualify his statement with any such limitation as to time.

3. Thomas did not mention this "softball"/"baseball" exchange in his grand jury testimony. Rather, he testified before the grand jury that Pino said that he and his traveling companion were "big *baseball* fan[s]" and were going to watch a game in Chicago on the following evening.

4. This citation was never processed and given to Pino.

pulled a pillow out of the rear portion of the vehicle. It appeared to Thomas that Llera could not see him because of the patrol lights and the rain.

Thomas tapped on the passenger window, and Llera hurriedly threw the pillow into the back portion of the car. The pillow produced a thumping sound audible to both Thomas and Phillips. Llera then rolled down the passenger side window. Thomas asked Llera for identification. Llera, who does not speak much English, appeared not to understand the question and started to exit the vehicle. Thomas again asked Llera for identification. Llera responded by exclaiming, "No cocaine."

Thomas then asked Llera if he had any marijuana or weapons. Llera shook his head. Thomas looked inside the vehicle and his gaze fell upon a small shaving kit bag in the front seat. Unbidden, Llera opened the bag. Llera then exited the vehicle and, without being requested to do so, began opening various other bags and containers in the vehicle, showing their contents to Thomas.

Thomas then looked at the pillow defendant had previously thrown into the very back of the station wagon. He reached in and patted the pillow inquiringly. Llera threw his hands in the air and shook his head, indicating that he did not know what was in the pillow.

In patting the pillow, Thomas noticed that it was hard, consistent with the earlier thumping sound it had produced when thrown into the back of the car by Llera. Thomas also noticed that the open end of the pillow case had been stitched with thread of a different color from that of the rest of the case. Thomas removed the stitching. The pillow case concealed some heavy, brown-taped packages. The packages contained a powdery substance later found to be cocaine. Thomas then searched an identical pillow in the car and found that it contained similar packages of powder. Thomas and Phillips then arrested both Pino and Llera for possession of cocaine.

## II. DEFENDANT LLERA

Llera contends that the district court erred in concluding that he lacks standing to assert that the search of the rental car violated his fourth amendment rights. Under *United States v. Salvucci*, 448 U.S. 83, 86, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980), Llera bore the burden of establishing fourth amendment standing. The ultimate issue upon which Llera bore the burden of proof is whether he had a legitimate expectation of privacy in the automobile or the pillows. *Rakas v. Illinois*, 439 U.S. 128, 144, 99 S.Ct. 421, 431, 58 L.Ed.2d 387 (1978).

In *Rakas*, the defendants, passengers in a car driven by another, argued that they had standing to assert that a search of the vehicle violated their fourth amendment rights by the mere fact that they were legitimately in the vehicle. The Court disagreed, noting, with special import, that the defendants "asserted neither a proprietary nor a possessory interest in the property seized." *Id.* at 148, 99 S.Ct. at 433.

In the instant case, the record clearly shows that Llera had neither a property nor possessory interest in either the rental car or the pillows. With regard to the rental car, the rental contract, itself, showed that *Pino* used his credit card to rent the vehicle and that Llera was not listed as an authorized driver of the vehicle. Indeed, as the troopers later learned, Llera's driver's license had been suspended, and he was therefore unable to legally drive the car. With regard to the pillows, Llera's action of throwing one of the pillows in the back of the station wagon upon Thomas's approach and his gesturing to the effect that he did not know what was in the pillows act as a clear disavowal of any property or possessory interest in them. Moreover, Llera did not testify at the suppression hearing which would have permitted him an opportunity to assert that he had either a property or possessory interest in the pillows without having such testimony used against him as an admission during a subsequent criminal trial. *United States v. Salvucci*, 448 U.S. at 88–89, 100 S.Ct. at 2551. In sum, the evidence

presented at the hearing does not demonstrate that the district court's factual finding that Llera had no interest in the car or the pillows was clearly erroneous. *United States v. Coleman*, 628 F.2d 961, 963 (6th Cir.1980). The district court did not err, therefore, in concluding that Llera did not have fourth amendment standing to challenge the search of the pillows.

## III.   DEFENDANT PINO

### A.   *The Initial Traffic Stop*

■ Pino first contends that the district court erred in concluding that Thomas's initial stop of his rental car was not violative of his fourth amendment right to be free from unreasonable seizures.[5] In analyzing the initial traffic stop of Pino, both Pino and the United States rely heavily on the seminal Eleventh Circuit cases of *United States v. Miller*, 821 F.2d 546 (11th Cir.1987), and *United States v. Smith*, 799 F.2d 704 (11th Cir.1986). In actuality, the *Miller* case is almost identical factually to the *Smith* case,[6] and the *Miller* court merely adopted the *Smith* court's analysis. *Miller*, 821 F.2d at 549. Consequently, we need only consider the *Smith* decision.

In *Smith*, a Florida Highway Patrol trooper observed a car on Interstate 95 which, to the trooper, matched the general characteristics of the drug courier profile. The trooper began following the vehicle. He observed that the vehicle crossed over the white painted edge line by about six inches then moved back into the right lane. The car then moved toward the center line but did not cross it. The vehicle "weaved" in a similar manner two additional times. The trooper then stopped the vehicle to investigate. The trooper testified at trial, however, that he did not stop the car because of the alleged "weaving" but to investigate whether the occupants of the car were transporting drugs. The district court determined that no traffic violation had occurred and that such a violation was

not the reason for the stop, but it also determined that the stop was made because the trooper suspected Smith was a drug courier and that the drug courier profile was an adequate basis for the stop. On appeal, the court of appeals agreed that a traffic violation was not an adequate basis and was not the basis for the stop but concluded, different from the district court, that the drug courier profile, on these facts, was not an adequate basis for the stop.

In the instant case, on the other hand, the district court found that Thomas's observation of the swerving of Pino's vehicle gave him probable cause to believe that Pino had violated one or more of the following Tennessee motor vehicle statutes: T.C.A. § 55–8–118(b) (overtaking a vehicle on the right), T.C.A. § 55–8–123(1) (failing to drive within a single lane), T.C.A. § 55–8–136 (failing to drive with due care to avoid colliding with a pedestrian), T.C.A. § 55–8–143 (failing to signal before changing lanes).

There is nothing in the record before us to indicate that the district court's factual finding that Thomas's observations gave him probable cause to believe that Pino had committed a traffic offense and that this was the reason for the stop is clearly erroneous. Accordingly, we need not decide the question whether, if there is adequate reason for a stop based on a traffic violation, it is necessary that it also be shown that this was in fact the reason for the stop.

Therefore, we hold that the stop of Pino's car did not infringe his fourth amendment rights.

### B.   *The Move to the Interstate Underpass*

■ Pino next argues that the district court erred in concluding that he was not subjected to an unreasonable seizure viola-

---

**5.** Had the initial traffic stop violated Pino's fourth amendment rights, it would have rendered the evidence discovered during the search of the pillows inadmissible under the "fruit of the poisonous tree" doctrine. *See Wong Sun v.*

*United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

**6.** Indeed, both cases involved the conduct of the *same* police officer.

tive of the fourth amendment when he was compelled to move his vehicle from the side of the interstate to the interstate underpass. We note initially that traffic stops are treated as a species of investigative detention as described and analyzed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Gonzalez*, 763 F.2d 1127, 1130 n. 1 (10th Cir. 1985). *See also Pennsylvania v. Mimms*, 434 U.S. 106, 109–11, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977) (per curiam) (analyzing reasonableness of police conduct during traffic stop for driving with expired license plates in terms of *Terry v. Ohio*). The question that the district court asked and that we must ask, then, is whether the move to the interstate underpass was more intrusive than necessary to fulfill the purpose of the stop. *United States v. Wiggins*, 828 F.2d 1199, 1202 (6th Cir.1987).

The district court concluded that the move to the underpass was necessary to shield Thomas and Pino from the rain and to promote the safety of vehicles passing by on the interstate. Additionally, the court noted that the move was not to a more institutional setting such as a police station or interrogation room. Consequently, the court concluded that the move was not more intrusive than necessary to effectuate the purposes of the traffic stop—i.e., to determine whether Pino committed a traffic offense and, if so, whether he could be trusted to mail in his file in lieu of being arrested and required to post bond.

We agree with the district court that the move to the interstate underpass did not result in a "more institutional setting," and, therefore, was no more intrusive than the original stop on the interstate. *See United States v. Vanichromanee*, 742 F.2d 340, 345 (7th Cir.1984). Granted, the underpass was more secluded than the shoulder of the interstate, but it was not a location that would have given a reasonable man in Pino's position the feeling that he was under arrest at this point. *See, e.g., Florida v. Royer*, 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983). Additionally, since only nine minutes, at the most, elapsed between the time that Pino was stopped on the interstate and the time

that Thomas finished questioning Pino and decided to arrest him, there is no issue that Pino's detention might have been so protracted as to become unnecessarily intrusive.

Pino contends before this court that the transfer to the interstate underpass was more intrusive than necessary to finish the investigation of his alleged traffic violation because Thomas retained his driver's license and rental car contract. This action, Pino argues, shows that he was not free to leave but, rather, effectively "arrested," in excess of the permissible limits of a *Terry*-type investigative stop. Pino cites the Supreme Court's plurality opinion in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), as supporting his position.

Pino's reliance on *Royer* is misguided. In *Royer*, Florida narcotics agents stopped Royer in Miami Airport to ask him some questions based on suspicions that he was carrying drugs. Royer's answers to these questions disclosed that he was traveling under an assumed name. The Court, after identifying these facts, stated:

> Second, the State submits that if Royer was seized, there existed reasonable, articulable suspicion to justify a temporary detention and that the limits of a Terry-type stop were never exceeded. We agree with the State that when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers—paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general—were adequate grounds for suspecting Royer of carrying drugs *and for temporarily detaining him* and his luggage while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention.

*Id.* at 502, 103 S.Ct. at 1326 (emphasis added). It is clear from the above quotation, then, that the officers did not violate Royer's fourth amendment right to be free of unreasonable seizure merely by detaining him. Rather, as the Court later made

clear, it was the manner in which Royer was detained—i.e., his driver's license and plane ticket were retained by the officers, he was taken to a very small room where he was virtually surrounded by law enforcement officials, and his luggage was removed from the plane—which violated his fourth amendment rights. Pino's reading of *Royer,* however, would reduce the *Terry*-type investigative stop to a completely consensual affair when, as the Court recognized in the *Royer* opinion, *Terry v. Ohio* allows for brief investigative *detentions* as well as consensual encounters between law enforcement officials and civilians as long as a reasonable, articulable suspicion of criminal activity exists. *Id.* at 505, 103 S.Ct. at 1328.

In the instant case, Thomas had more than a reasonable and articulable suspicion of unlawful activity on the part of Pino at the time he required Pino to move his car off the Interstate to the underpass—he had probable cause to believe that Pino had violated the Tennessee traffic code based on first-hand observation. Consequently, Thomas had every right to detain Pino to investigate the traffic offense. Thomas's retention of Pino's driver's license and rental car contract during the move to the underpass was a symbolic gesture that Pino was not free to leave until Thomas completed his investigation. Such retention, however, did not render the move to the underpass more intrusive than reasonably necessary to effectuate the investigative purposes of the detention.

■ Pino also argues that Thomas and Phillip's subsequent request for consent to search the rental car was more intrusive than necessary to carry out the purpose of the investigative stop since such a search was in no way related to his traffic violation. It must be remembered, however, that Thomas had already decided to arrest Pino prior to making this request. As we shall conclude in Part IIIC, *infra,* under such circumstances, no warrant or consent was necessary prior to searching the pas-

senger compartment of the vehicle. Even had Thomas not yet decided to make a lawful, custodial arrest of Pino at the point in time at which he requested Pino's consent to search the vehicle, such a request, in this non-intrusive atmosphere, was perfectly legitimate in that Thomas had a reasonable suspicion that defendants were carrying contraband, given that Pino and Llera matched many of the characteristics of the drug courier profile and that Pino had given false answers to some of Thomas's questions. *See Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).

### C. *The Search of the Pillows*

■ Pino finally contends that, even if he was not unlawfully seized, Thomas's search of the pillows violated his fourth amendment rights since Thomas did not have a search warrant. We conclude, however, that Thomas's warrantless search was constitutionally permissible under the search-incident-to-a-lawful-arrest exception to the warrant requirement.[7] *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

Pino does not contend before this court that the custodial arrest of him was unlawful. Tennessee law clearly provides for the custodial arrest of a traffic offender if there is "a reasonable likelihood ... that the arrested person will fail to appear in court." T.C.A. § 40–7–118(c)(5).

Pino does argue, however, that, since he was being arrested for a mere traffic violation, the rule allowing search of the passenger compartment of a vehicle announced in *Belton* does not apply. He cites *United States v. Gonzalez,* 763 F.2d 1127, 1130 n. 1 (10th Cir.1985), for this proposition.

Pino misconstrues *Gonzalez.* In *Gonzalez* the Tenth Circuit held that a *traffic stop* to issue a citation is like an investigative detention, and, therefore, *Belton* does not allow search of the interior of the passenger compartment of a vehicle incident to such a stop. In the instant case, however,

---

**7.** By limiting our analysis to this exception to the warrant requirement, we by no means intend to disparage the United States' other two justifications for the warrantless search, to wit: (1) the inventory-search/inevitable-discovery exception; and (2) the automobile search exception.

the rental car was not searched incident to the *traffic stop*—it was searched incident to a lawful custodial *arrest.* *Belton* is therefore applicable.

Pino also contends that the rear section of a mid-sized station wagon is not within the "passenger compartment" described in *Belton.* No court of appeals has dealt with this precise issue. But in *United States v. Russell,* 670 F.2d 323 (D.C. Cir.), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982), the Court of Appeals for the District of Columbia dealt with the very similar issue of whether the back of a hatch-back is within the passenger compartment. The court concluded that the back of a hatch-back is indeed part of the passenger compartment for purposes of *Belton,* relying heavily on Professor La Fave's proposed rule that a "passenger compartment" for *Belton* purposes is properly viewed " 'as including all space reachable without exiting the vehicle,' " excluding areas that would require dismantling the vehicle. *Id.* at 326 (quoting 2 W. LA FAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 7.1, at 132 & n. 9.2 (Supp.1982)). Professor La Fave's rule, as the District of Columbia Circuit saw it, satisfies the twin objectives of *Belton* in preventing a suspect's access to weapons and easily-destroyed evidence within his vehicle and creating a standardized rule of criminal procedure which the police can follow routinely. *Russell,* 670 F.2d at 326.

We agree with our colleagues on the District of Columbia Circuit that adoption of Professor La Fave's rule is in harmony with and would further the policies announced in *Belton.* In the instant case, then, since the rear section of a mid-sized station wagon is reachable without exiting the vehicle, Thomas's search of the pillows found in that section was permissible incident to his lawful arrest of Pino.

### IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.