UNITED STATES of America, Plaintiff,

v.

James E. SCHUSTER, Defendant.

No. 90–CR–58–S.

United States District Court,
W.D. Wisconsin.

Sept. 6, 1990.

Ruth Braswell, Asst. U.S. Atty., Madison, Wis., for plaintiff.

Morris Berman, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

The report and recommendation of the Hon. James Groh, United States Magistrate for the Western District of Wisconsin, in the above entitled matter, dated August 20, 1990, recommends that the defendant's motion to suppress evidence seized pursuant to a search warrant be denied. Subsequent to the report the defendant objected to said recommendation and once again filed with the Court his memorandum of July 20, 1990 entitled "Memorandum on Issues of Curtilage and Standing in Support of Motion to Suppress." The defendant apparently does not request that the Court review the probable cause issue and, accordingly, it shall make a *de novo* determination of the disputed portions of the report which, based upon that memorandum of the defendant referred to herein, appear to be standing and curtilage. It may be that the facts are in dispute; however, this cannot be discerned from the objection offered by the defendant. In any event, the Court's examination of the record discloses that the defendant James E. Schuster is charged with one count of conspiring with Ervin L. Harnois to possess marijuana plants with intent to manufacture in violation of 21 U.S.C. §§ 846 and 841(a)(1) during the period June 1, 1986, to August 1, 1989.

On July 31, 1989, an acting Circuit Court Judge of Bayfield County, Wisconsin, issued a warrant to search the property, house and outbuildings of Harnois located four miles west of Iron River, Bayfield County, Wisconsin, for marijuana and items related to the growing and processing of the marijuana. A sworn complaint by Bayfield County Deputy Sheriff James Jacobson was the basis for the warrant. The complaint, as correctly summarized by the Magistrate, follows.

Jacobson learned from a citizen informant in the latter part of 1988 that Harnois was believed to be growing marijuana behind his residence. Jacobson conducted an aerial surveillance of the residence at an altitude of about 2,500 feet on July 26,

1989, and observed what he believed to be marijuana growing in three different locations in the woods north of the Harnois residence. Jacobson also approached the residence on foot on June 17 and July 11, 1989, and found evidence of past and present marijuana cultivation in those woods. On July 15, 1989 he also took aerial photos. The two photographs of the garden taken by Jacobson were attached to his complaint.

On July 31, 1989, Jacobson and Chet Lonczak, United States Forest Special Agent, approached the property on foot from the east, discovering two marijuana gardens under cultivation in a low, swampy area in the woods to the north of defendant's garage and shed. One garden contained 25 growing marijuana plants, a water drum, garden fertilizer and a hoe. The other, located about 150–200 feet north of the garage and storage shed, contained about 60 growing plants individually potted in five-gallon containers. The grass indicated frequent use and discarded marijuana leaflets indicated manicuring. A sample from one of the plants tested positive for marijuana. Jacobson's past experience led him to observe that marijuana could be cultivated both indoors and outdoors, that harvesting could be undertaken during July of 1989, and that harvested plants are dried in enclosures, including houses and outbuildings, which buildings were apparently located within the curtilage of the Harnois house.

The warrant was executed on August 1, 1989, and the search produced 182 growing marijuana plants in the gardens and about six pounds of packaged marijuana in the house, to include various other items relating to the producing and selling of marijuana.

On March 9, 1990, the Wisconsin Division of Criminal Investigation Special Agent Jill Sandor interviewed Debra Carlson, who identified herself as a longtime friend of Harnois, about his relationship with defendant Schuster. The information provided by Carlson is included in Sandor's report, which describes events occurring in 1987 and 1988 wherein Carlson reported her observations of the defendant bringing plants and seedlings to Harnois on three occasions during that period.

Although the defendant describes those facts as found by the Magistrate in a conclusory fashion, they may be considered as they concern the issue of standing. The Court finds that Jacobson entered the Harnois property as found by the Magistrate prior to the issuance of the warrant; that Carlson specifically informed Special Agent Sandor that she observed James Schuster bringing plants and seedlings to the Harnois residence in 1987–1988 and that the items were stored therein.

The statement of facts and conclusions most favorable to the defendant, however, does not in any way suggest the bailor/bailee relationship which the defendant alleges.

## ISSUE OF STANDING

The defendant claims an interest in the Harnois property by virtue of a bailment relationship. As determined by the Magistrate, he has failed to make the threshold factual showing which is required before an evidentiary hearing will be held. The Court need only grant a suppression hearing when a defendant presents facts which are definite, specific, detailed and nonconjectural. Here we only have information from Carlson contained in Sandor's report which describes events occurring in 1987 and 1988. The search took place in August 1989. There is nothing in the report to connect the defendant with the cultivation of marijuana by Harnois in 1989. The report does not in any way suggest the bailment relationship which the defendant attempts to infer. The two persons who could have definitely, specifically, and in detailed fashion suggested a bailment relationship have failed in any way whatsoever to do so.

With nothing more than that submitted by the defendant there is no justification for holding an evidentiary hearing in this matter, nor is there determined to be a bailment relationship existing between Harnois and the defendant. Even had, however, that bailment relationship been

established the circumstances would not have provided the defendant standing to challenge the search. Defendant makes no attempt to suggest an interest in the Harnois property that is the "invaded place." None of the following factors to be considered receives an affirmative answer. Those factors as stated in *United States v. Duprey*, 895 F.2d 303, 309 (7th Cir.1989) are as follows:

> (1) whether the defendant has a possessory interest in the place searched; (2) whether he has a right to exclude others therefrom; (3) whether he has exhibited a subjective expectation that the place remains free from governmental invasion; (4) whether normal precautions were taken to protect his privacy; and (5) whether he was legitimately on the premises.

Fourth Amendment rights are personal rights and are stated in *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978) as follows:

> A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. *Alderman* [*v. United States*], *supra* [394 U.S. 165], at 174 [89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969)]. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, *United States v. Calandra*, 414 U.S. 338, 347 [94 S.Ct. 613, 619, 38 L.Ed.2d 561] (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

Further, assuming that a bailment existed, defendant remains unable to prevail as previously determined by the Seventh Circuit Court of Appeals in *United States v. Lisk*, 522 F.2d 228 (7th Cir.1975).

> Hunt's car was searched and defendant's property was seized. The invasion of Hunt's privacy was a violation of Hunt's Fourth Amendment rights, but this violation is clearly not available to the defendant as a basis for suppressing evidence acquired thereby. Defendant must rely on the seizure of the firearm as a violation of his own Fourth Amendment rights. But if we assume that his rights were untouched by the search of Hunt's car, as far as defendant is concerned the case is the same as though the firearm had been found in plain view in a public place and then seized.

*Id.* at 230 (footnote omitted).

Summarily stated, the defendant has failed to show in his motion to suppress that a bailment relationship existed between the defendant and Harnois. Even had that bailment relationship been shown to exist this defendant has no standing to pursue his motion to suppress because any search of the Harnois property was not in any way a violation of the defendant's Fourth Amendment rights.

### THE CURTILAGE ISSUE

The Magistrate correctly determined that whether the property in question falls within or outside of the curtilage is dependent upon a consideration of the following four factors:

> (1) the proximity of the area claimed to be the curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987).

As found by the Magistrate, there is no fence or other man-made enclosure surrounding the home. The northern extremity of the area in which the house and other buildings are located is defined by a tree line, beyond which are the woods in which the marijuana gardens were found. The record does not disclose that the officers entered the open area around the buildings at any time prior to issuance of the warrant. The gardens can hardly be characterized as "so associated with the activities and privacies of domestic life that the officers should have deemed [it] as part of [Harnois'] home," particularly where the

gardens were devoted to the surreptitious cultivation of contraband and situated in otherwise undeveloped woodland. One of the gardens was 150–200 feet north of the garage and storage area, which garage was located about 100 feet north of the Harnois home. The other two are well beyond the tree line. Nothing was done to protect the gardens from observation, and simply hiding them in the woods in their natural state is not enough. No evidence of any barrier to prevent others from seeing or intruding upon the gardens has been shown to exist. This Court accepts the conclusion that the officers did not violate the curtilage of the residence of Harnois in collecting evidence for the warrant.

 Although not pursued by the defendant in his objection to the Magistrate's report and recommendation, the Court further accepts the conclusion of the Magistrate that the issuing judge had a substantial basis for his finding of probable cause. The residence and outbuildings of Harnois were the only reasonable places to look for evidence in light of all of those circumstances described herein. Harnois was reasonably believed to be growing a sizeable quantity of marijuana. It was reasonable to assume that harvesting operations may have commenced, and certainly a likely and secure place for storing the growing materials and for drying and processing the plants for distribution was the residence and outbuildings of Harnois, a short distance from the gardens. It is a practical and common sense answer to conclude that the harvested crop and the related implements and materials would be found in those buildings.

 Accordingly, this Court adopts the findings of fact, conclusions of law and recommendations as proposed in the report and recommendation of the Magistrate.

1. Harnois was previously indicted separately for possessing with intent to manufacture 100 or more marijuana plants and possessing marijuana with intent to distribute. He was convicted of the latter count following a guilty plea. *United States v. Harnois*, Case No. 89–CR–117–S.

2. The moving papers include the warrant and complaint and a hand-drawn map of the premises. These are exhibits 1 and 2 to the affidavit of

## ORDER

IT IS ORDERED that the defendant's motion to suppress evidence seized pursuant to the search warrant is DENIED.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate Judge.

Defendant, James E. Schuster, is charged with one count of conspiring with Ervin L. Harnois to possess marijuana plants with intent to manufacture in violation of 21 U.S.C. §§ 846, 841(a)(1), during the period June 1, 1986 to August 1, 1989.[1] Defendant moves to suppress evidence seized pursuant to a warrant to search Harnois' residence and property on the grounds that the affidavit was based on information obtained during an unlawful warrantless intrusion onto the property and that there was no probable cause for its issuance. (Dkt. # 15) Finding that the defendant is without standing to challenge the constitutionality of the search, I will recommend that the motion be denied.

### *Factual Background*[2]

On July 31, 1989, an acting Circuit Court Judge of Bayfield County, Wisconsin (whose name is illegible) issued a warrant to search the property, house and outbuildings of Ervin L. Harnois located four miles west of Iron River, Bayfield County, Wisconsin, for marijuana and items related to the growing and processing of it. The warrant was based on the sworn complaint of Bayfield County Deputy Sheriff James Jacobson.

The substance of the complaint may be summarized as follows: In late 1988 Dep. Jacobson learned from a citizen informant that Ervin Harnois was believed to be

defendant's attorney which is attached to the motion. (Dkt. # 15). Counsel has also submitted a supplemental affidavit (Dkt. # 36) to which are attached the first page of a report of Wisconsin DCI Agent Jill Sandor dated March 9, 1990 (Ex. A), and the August 9, 1989, case report of Bayfield County Deputy Sheriff James Jacobson (Ex. B).

growing marijuana behind his residence. On July 26, 1989, Dep. Jacobson conducted an aerial surveillance of the residence at an altitude of about 2500 feet and observed (and photographed) what he believed to be marijuana growing in three different locations in the woods north of Harnois' residence.[3] On July 31, 1989, Dep. Jacobson and U.S. Forest Service Special Agent Chet Lonczak approached the property on foot from the east and discovered two marijuana gardens under cultivation in a low, swampy area in the woods to the north of defendant's garage and shed. (See Map, Ex. 2, Dkt. # 15) One garden contained 25 growing marijuana plants, a water drum, garden fertilizer and a hoe. The other, located about 150–200 feet north of the garage and storage shed, contained about 60 growing plants, individually potted and in 5-gallon containers.[4] The grass in the area was matted down indicating frequent use, and discarded marijuana leaflets indicated manicuring. A sample from one of the plants tested positive for marijuana. The complaint also related Det. Jacobson's observation, based on his experience, that marijuana could be cultivated indoors and out, that harvesting could be undertaken at that time of year and that harvested plants are dried in enclosures including houses and outbuildings. "Complainant observed buildings located within the curtilage of the aforesaid house."

The warrant was executed on the morning of August 1, 1989. (Ex. B, Dkt. # 36) The search produced 182 growing marijuana plants in the gardens and about 6 pounds of packaged marijuana were found in the house. Various other items relating to raising and selling marijuana were also found.[5] (*Id.* at 1)

On March 9, 1990, Wisconsin Division of Criminal Investigation Special Agent Jill Sandor interviewed Debra Carlson, who identified herself as a longtime friend of Harnois, about his relationship with defendant. (Ex. 1, Dkt. # 36)[6]

*Conclusions of Law*

Defendant contends that the warrant for the search of the Harnois property was issued on the basis of information obtained by Dep. Jacobson during an unlawful entry upon the curtilage of Harnois' residence, and, further, that the complaint fails to establish probable cause for the issuance of a warrant to search any of the buildings. Before reaching those issues, however, it is necessary to address the preliminary question of defendant's standing to challenge the constitutionality of the search of Harnois' property.[7]

It is a first principle of Fourth Amendment jurisprudence that one may not assert a violation of someone else's

3. According to his police report, Dep. Jacobson also approached the residence on foot on June 17 and July 11, 1989, and discovered evidence of past and present marijuana cultivation in the woods north of the house. He also flew over the house and took photos on July 15, 1989. (Ex. B at 2, Dkt. # 36)

4. Dep. Jacobson attached two photographs of this garden to his complaint. (The copies submitted here are indecipherable.)

5. The inventory has not been included in defendant's submissions.

6. According to Agent Sandor's report, Ms. Carlson related her acquaintanceship with Harnois and defendant, her observations of Schuster bringing marijuana plants and seed to Harnois' residence in 1987–1988, and Harnois statement to her that he and defendant were growing marijuana. However, I have not included this matter in my findings because Agent Sandor's report is not competent evidence of what Ms. Carlson saw and heard. Debra Carlson' statement to Sandor is hearsay and cannot be considered on this motion. The pretrial scheduling order (Dkt. # 11), in conformity with *United States v. Hamm,* 786 F.2d 804, 807 (7th Cir. 1986), explicitly requires that assertions of fact in pretrial motions must be supported by the affidavits of persons competent to testify to those facts.

7. The use of the term "standing" to describe defendant's interest in challenging the search of another person's property should not be construed as having any jurisdictional connotations. In *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 428–29 (1978), the Supreme Court recognized that "this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing...." Nevertheless, "standing" continues to have favor as a convenient term of art.

Fourth Amendment rights to procure the suppression of evidence.

> "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." [citations omitted] A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.

*Rakas v. Illinois,* 439 U.S. 128, 133–134, 99 S.Ct. 421, 425–26 (1978) (quoting *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)). A movant has the burden of establishing that he was himself the victim of impermissible conduct—that he had a legitimate expectation of privacy in the place searched which was violated by the search. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). This burden is met only if defendant establishes (1) that he "by his conduct, has 'exhibited an actual (subjective) expectation of privacy'" and (2) that this "subjective expectation of privacy is 'one that society is prepared to recognize as reasonable;'" that is "'justifiable' under the circumstances." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citation omitted).

Defendant argues that he had an interest in the Harnois property by virtue of a bailment relationship allegedly based upon defendant's provision of marijuana seedlings to Harnois' for cultivation. (Def.Br. at 2, Dkt. # 37) This contention falters at the outset, as defendant has failed even to make the threshold factual showing that would be required before an evidentiary hearing could be ordered.

> [A] trial court need only grant a suppression hearing when a defendant presents facts justifying relief, that is, facts which are definite, specific, detailed and nonconjectural.

*United States v. Hamm,* 786 F.2d 804, 807 (7th Cir.1986). Where standing is the issue

> [a] defendant establishes a colorable standing claim by alleging sufficient facts to create a reasonable impression with the Court of the objective rationality (of the above [*Smith* ] standard) of his or her professed subjective privacy allegations.

*United States v. Gerena,* 662 F.Supp. 1218, 1238 (D.Conn.1987).

The only "proof" defendant has presented to support his claim is the double hearsay information from Debra Carlson contained in Agent Sandor's report. That information is obviously of no probative value.[8] But even if defendant had presented that information in the form of Ms. Carlson's own affidavit, it would be inadequate to establish a colorable standing claim. The report purports to describe events which occurred in 1987–1988, but the search took place in August, 1989—a different crop year. There is simply nothing in Agent Sandor's report to connect defendant to Harnois' marijuana cultivation in 1989. That fatal weakness aside, the report also doesn't describe any words or conduct of defendant from which a bailment relationship may be inferred. It says only that defendant was seen delivering plants and seeds to Harnois on three occasions. The only evidence illuminating the relationship is the even more remote hearsay statement of Harnois that he and defendant were growing marijuana together. But that reveals nothing of their arrangements.

---

**8.** That Agent Sandor made a report of her conversation with Ms. Carlson neither validates nor endorses Ms. Carlson's information. Other courts have noted the risk of reliance upon materials provided by the government as a means of establishing standing.

> Defendants, not the Government, are in the best position to apprise the Court of the legitimate basis for their standing allegations. Indeed, it is their duty to do so. For the purposes of establishing the existence of a subjective expectation of privacy (let alone the reasonableness of this expectation), reliance on what the Government believes to be true is a poor substitute for factual averments that fully set forth what a particular defendant believes to be the facts of his or her case.

*Gerena,* 662 F.Supp. at 1250–1251. See *United States v. Pino,* 855 F.2d 357, 360 (6th Cir.1988), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990).

If a bailment relationship actually existed, the two persons (perhaps the only persons) who were in the best position to provide a sworn statement to that effect were defendant himself and Harnois. Defendant's failure to provide an affidavit by one or the other in support is inexplicable. Indeed, defendant's failure to provide sworn support for his own claim strongly indicates its lack of merit, as he was exposed to no risk in doing so. The Supreme Court has long held that a defendant's statements for the purpose of establishing standing for a Fourth Amendment challenge are not admissible against him at trial, *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968); *United States v. Salvucci*, 448 U.S. 83, 86–95, 100 S.Ct. 2547, 2550–55, 65 L.Ed.2d 619 (1980).

But even if it were taken as established that defendant and Harnois were engaged together in the growing of marijuana, or that defendant retained an ownership or possessory interest in the marijuana found in the search, neither such circumstance gives defendant standing to challenge the search.

Defendant's claim falters here on the fundamental premise that the privacy interest protected by the Fourth Amendment must be found to exist in the *place* searched, not in the articles sought. While an ownership or possessory interest in the objects of the search is a factor to be considered,

> [p]roperty rights are neither the beginning nor the end of this Court's inquiry. In *Rakas*, this Court held that an illegal search *only* violates the rights of those who have "a legitimate expectation of privacy *in the invaded place*." 439 U.S. at 140, 99 S.Ct. at 428–29.

*Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–53 (emphasis added).[9] Defendant Schuster makes no pretense of an interest in the Harnois property, "the invaded place."[10]

The Court of Appeals for the Seventh Circuit has only recently summarized the factors to be considered on that inquiry, including:

> (1) whether the defendant has a possessory interest in the place searched; (2) whether he has a right to exclude others therefrom; (3) whether he has exhibited a subjective expectation that the place remains free from governmental invasion; (4) whether normal precautions were taken to protect his privacy; and (5) whether he was legitimately on the premises.

*United States v. Duprey*, 895 F.2d 303, 309 (7th Cir.1989). Applying these tests to defendant (as distinguished from Harnois) there is simply no evidence to suggest an affirmative answer to any of these questions.[11] Compare *United States v. Nabors*, 761 F.2d 465, 469 (8th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985); *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982).

That Harnois, defendant's co-conspirator, may have had a legitimate expectation of privacy in his residence may be conceded. However, that does not avail defendant. To reiterate, Fourth Amendment rights are personal rights, and may not be exercised vicariously. *Rakas*, 439 U.S. at 133–134, 99 S.Ct. at 425–26.[12] The specific applica-

---

9. Indeed, the *Salvucci* decision expressly overruled *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to the extent *Jones* had recognized "automatic standing" in cases in which the defendant was charged with the possession of the object seized in the search (stolen mail in *Salvucci*).

10. His interest in keeping the marijuana hidden is not enough. See *United States v. Sarda–Villa*, 760 F.2d 1232, 1236–1237 (11th Cir.1985) ("[W]e are not willing to say that society is prepared to recognize a justifiable expectation of privacy solely on the basis of appellants' efforts to secrete the contraband.")

11. Nor has he troubled to file a reply brief in response to the government's assertion in this regard.

12. As explained in *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967 (1969), "There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim

tion of this principle to co-conspirators was unequivocally pronounced by the Supreme Court over twenty years ago.

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. *Co-conspirators and codefendants have been accorded no special standing.*

*Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965–66 (1969) (emphasis added). See also *United States v. DeLeon*, 641 F.2d 330, 337 (5th Cir. Unit A 1981) (rule applied to agents and co-conspirators); *United States v. Hodges*, 606 F.2d 520, 523 (5th Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980) (one partner may not assert the privacy interest of another).

Nor am I persuaded by defendant's argument that his provision of marijuana plants to Harnois for their joint horticultural enterprise created a bailment relationship which was sufficient to create a judicially cognizable expectation of privacy. This contention does find some support in a Ninth Circuit decision in which two pilots, who had delivered a cargo of marijuana (in which they retained an ownership interest) to their co-defendants, were permitted to challenge a subsequent, unlawful search of the containers based upon their bailor/bailee relationship (a "formalized arrangement") with the co-defendants. *United States v. Johns*, 707 F.2d 1093 (9th Cir.1983), *reversed on other grounds*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985).

Whatever vitality *Johns* may have in the Ninth Circuit, the holding is in direct conflict with that of the Court of Appeals for the Seventh Circuit in *United States v. Lisk*, 522 F.2d 228 (7th Cir.1975), *cert. de-*

*nied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976). There, the defendant gave a bomb to Michael Hunt to hold for him until defendant asked for it back. The bomb was placed in the trunk of Hunt's car and remained there until the police found it in an unlawful search of the car several days later. The trial court granted defendant's motion to suppress. The Court of Appeals, by Judge (now Justice) Stevens, reversed, holding that the defendant's mere ownership of the item seized did not give him standing to object to the unlawful search of Hunt's vehicle.

> Hunt's car was searched and defendant's property was seized. The invasion of Hunt's privacy was a violation of Hunt's Fourth Amendment rights, but this violation is clearly not available to the defendant as a basis for suppressing evidence acquired thereby. Defendant must rely on the seizure of the firearm as a violation of his own Fourth Amendment rights. But if we assume that his rights were untouched by the search of Hunt's car, as far as defendant is concerned the case is the same as though the firearm had been found in plain view in a public place and then seized.

*Id.*, at 230 (footnote omitted).

The claim of defendant Schuster is precisely the same as that of the defendant in *Lisk*—that his interest in the marijuana seized establishes his standing to challenge the constitutionality of the search of Harnois' house. *Lisk* flatly rejects that premise, as did the Supreme Court when it confronted the question. *Rawlings v. Kentucky*, 448 U.S. 98, 105–106, 100 S.Ct. 2556, 2561–62 (citing *Rakas*, 439 U.S. at 149–150, 99 S.Ct. at 433–34; *Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–53).[13] As defendant neither has, nor claims, any expectation of privacy in the area searched, his constitutional challenge to the search cannot be entertained. *Salvucci*, 448 U.S. at

---

can and very probably will object for himself when and if it becomes important for him to do so." Harnois had the opportunity (see n. 1, *supra*) and I take judicial notice of the fact that he did not choose to exercise it.

**13.** The Court in *Salvucci* cited *Lisk* with regard to the separate question of the right of an owner to challenge the unlawful *seizure* of property on a motion for its return. 448 U.S. at 91, n. 6, 100 S.Ct. at 2552 n. 6. See *Lisk*, 522 F.2d at 230–231. However that issue is not before the court on this motion.

93, 100 S.Ct. at 2553–54. I will therefore recommend that the motion to suppress be denied.

Although not necessary to the disposition of the motion, I also conclude, from the record before me, that defendant's motion must be denied on the merits as well.

Defendant contends first that Dep. Jacobson obtained the search warrant through the use of information obtained as a result of his unlawful intrusion upon the curtilage of the residence. I conclude that there is insufficient factual support for the claim to warrant an evidentiary hearing.

■ The law distinguishes between the curtilage—the land immediately surrounding the home and, thus, considered a part of it—which is entitled to Fourth Amendment protection, and the land outside the curtilage, which, though it might be on the same private property, is not so protected. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). In determining whether the property in question falls within or outside of the curtilage four factors are considered:

■ the proximity of the area claimed to be the curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987).

Applying that standard to defendant's submissions in this case, no intrusion onto the curtilage is apparent. The second and third factors are the key ones here. While there is no fence or other man-made enclosure surrounding the home, it is obvious from the map (Ex. 2, Dkt. # 15) that the northern extremity of the area in which the house and other buildings sit is defined by a tree line, beyond which are the woods in which the marijuana gardens were found. The gardens were reached by traveling through the woods from the west or the east. There is nothing to suggest that the officers ever entered upon the open area around the buildings or that the gardens were even visible from that area. Being devoted to the surreptitious cultivation of contraband and situated in otherwise undeveloped woodland, the gardens can hardly be characterized as "so associated with the activities and privacies of domestic life that the officers should have deemed [it] as part of [Harnois'] home." *Dunn*, 480 U.S. at 303, 107 S.Ct. at 1140.[14]

In this context, the first factor, the distance from the gardens to the house is of less significance, but the submissions leave the impression that it is not insubstantial. Dep. Jacobson's affidavit states that one of the gardens was 150–200 feet north of the garage and storage area, which, in turn, was located about 100 feet north of the home. Assuming that to be the farthest garden, the other two still appear to be well beyond the tree line (although the map is not to scale). Compare the barn held to be outside the curtilage of a home 60 yards away in *Dunn*, 480 U.S. at 302, 107 S.Ct. at 1140. In any case, if more exact measurements and locations were relevant, it was up to defendant to provide them.

Finally, there is nothing to indicate that anything was done to protect the gardens from observation. Simply hiding them in the woods in their natural state is not enough. See *Oliver*, 466 U.S. at 182, 104 S.Ct. at 1743. There is no evidence of any sort of barrier erected to prevent others from seeing or intruding upon them.

For these reasons, I conclude that the police did not violate the curtilage of Harnois' residence in collecting the evidence for the warrant.

I also reject defendant's contention that the issuing judge lacked a substantial basis for his finding of probable cause. According to the affidavit, a citizen informant reported that Harnois was growing marijuana behind his residence, a fact corroborated by the discovery of the gardens

---

**14.** It is also relevant on this point that Det. Jacobson took twice to the air just to locate the gardens. Defendant does not contend that these fly-overs were unlawful encroachments.

themselves together with gardening equipment and evidence of harvesting activity.

■ The familiar test for probable cause to issue a search warrant was stated in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983):

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

The instant motion does not invite a *de novo* review of the affidavit but simply addresses the issue of whether there was a "substantial basis" for the judge's determination that probable cause existed. *Id.* at 236, 238–239, 103 S.Ct. at 2332–33. Indeed, reviewing courts are admonished to pay "great deference" to the determinations of the issuing magistrates.

> "A grudging or negative attitude by reviewing courts toward warrants," [*United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense manner." *Id.*, at 109, 85 S.Ct. at 746.

*Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. See also *United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir.1984).

On the facts presented in the complaint, it would have been difficult to escape the conclusion that someone was engaged in substantial marijuana growing. Since the gardens were in the woods, anyone could have been the culprit, but the informant's tip and the proximity to Harnois' residence were enough to lead a reasonable person to the belief that it was he. To have located the gardens that close to someone else's residence would have seriously compromised their security.

■ Proof of a suspect's complicity in a crime is, of itself, insufficient to provide probable cause to search his home or property. Some connection must be established between the offense and the place to be searched. As explained in *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979):

> [T]he nexus between the objects to be seized and the premises searched do not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences ... [about the suspect's probable behavior].

See, *United States v. Rambis*, 686 F.2d 620, 624 (7th Cir.1982), to the same effect. I am satisfied that that nexus may permissibly be inferred here.

■ There is, of course, no direct evidence pointing to the presence of marijuana or related materials in or around Harnois' house and property. But, as noted in *Charest*, direct evidence is not required. See *United States v. McNeese*, 901 F.2d 585, 596 (7th Cir.1990); *United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). There was probable cause to believe that Harnois was operating a marijuana farm of some dimension a short distance from his residence, and it is reasonable to infer that he, like any farmer, must also have possessed the goods and paraphernalia necessary to planting, raising and harvesting his crop, as well as a place for storing and processing it for market. From the complaint we also know that it was time for harvest and that some harvesting had perhaps actually begun. The question, then, is where were the harvested crop and the related implements and materials to be found?

The "practical, commonsense" answer is, I think, immediately evident. Harnois was essentially engaged in an agricultural pursuit—raising a field crop. It is common knowledge that farmers normally keep their tools, equipment, seeds and other goods and materials required for producing crops at the farmstead where the residence, barn or other outbuildings are locat-

ed. The same is generally true of the harvested crops; especially if further processing is required over time, as in the case of tobacco.[15] There is no reason to think that these same practices would not be followed in connection with Harnois' agricultural undertakings. In fact, one in Harnois' position had a more compelling reason for keeping the harvested crop and all other evidence of the enterprise in, or in the vicinity of, his residence—security from unwanted disclosure of his activities as well as the risk of theft of the processed crop.

It is possible, of course, that Harnois maintained a separate, hidden facility for all these things. And it is also true that neither Dep. Jacobson nor the judge could say that the objects of the search would actually be found in the places described. But neither of these considerations is controlling. As Justice (then Judge) Kennedy explained:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched ... or that the evidence is more likely than not to be found where the search takes place.... *The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.*

*United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.1985), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (emphasis added in part) (citations omitted). To my mind, Harnois' residence and outbuildings were not only reasonable places to look for the evidence, they were the *only* reasonable places.

It was also reasonable to look for the contraband at Harnois' residence if he is viewed in the capacity of a drug dealer rather than a farmer. Authorities abound for the proposition.

> Realizing that it is likely that narcotics distributors would keep the drugs, implements of distribution, records and proceeds in their residences, we find it *reasonable to assume* that a search of those premises would contain certain evidence. The affidavit *need not contain personal observations that such evidence was kept at the residences.*

*United States v. McNeese*, 901 F.2d 585, 596 (7th Cir.1990) (emphasis added) (citations omitted).

> It is certainly reasonable to suggest that drug dealers may have their stock in trade secreted in any of the places where they live as well as in their vehicles or on their persons.

*Johnson v. Petersen*, 563 F.Supp. 672, 676 (W.D.Wis.1983) (citing *Valenzuela*, 596 F.2d at 828–829). See also *United States v. Spearman*, 532 F.2d 132, 133 (9th Cir. 1976) (per curiam) (upholding warrant based on officer's statement that heroin dealers are likely to have packaged drugs in their cars); *United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir.1978) (court infers that "[h]eroin importers commonly have heroin and paraphernalia where they live."); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir.1986) (reasonable to infer that drug conspirators keep records of conspiracy at residence). See also *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985).

There is no reason to apply any different principles in this case. Harnois was reasonably believed to be growing a sizeable (commercial) quantity of marijuana. Harvesting operations may have begun. A likely and secure place for storing the growing materials and for drying and processing the plants for distribution was Harnois' own residence and outbuildings just a short distance away.

I therefore conclude that the complaint contained a substantial basis for the judge's finding of probable cause.

For all the above reasons, I will recommend that the motion to suppress be denied.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C.

---

**15.** An exception may be noted for some crops, such as hay, which will not be damaged by exposure to the elements. These are sometimes left stacked in the field until needed. Harnois' crop does not fall into this category.

§ 636(b)(1)(B), that defendant's Motion to Suppress be DENIED.

ENTERED this 20th day of August, 1990.